GRAYFORD J. MESICK et al., Respondents, v STATE OF NEW YORK, Appellant.

Third Department, July 3, 1986

## APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Michael S. Buskus* of counsel), for appellant.

*Carter, Conboy, Bardwell, Case & Blackmore (James S. Carter* of counsel), for respondents.

## OPINION OF THE COURT

MAHONEY, P. J.

The State owns a parcel of property known as Honeysuckle Rock which is located along the Kinderhook Creek in the Town of Chatham, Columbia County. The area was posted with signs limiting the permissible use of the area to fishing. Other activities were declared to be unlawful. Despite such restrictions, a water hole located along the property was frequently used for swimming. Unknown persons attached a rope to a tree branch that extended out toward the water. Below the branch was a steep rocky bank. Swimmers often

used the rope to swing out into the water. It was necessary to swing out far enough to clear the rocky bank in order to safely reach the water. Employees of the State were aware that Honeysuckle Rock was used for swimming and that swimmers used the rope to swing out into the water. In fact, the State Police had been advised, in 1979, that a girl broke her wrist when she lost her grip on the rope and fell onto the rocks below. The State never took any action to prevent swimming at Honeysuckle Rock or to prevent the use of the rope.

On May 30, 1981, 17-year-old claimant Grayford John Mesick (hereinafter claimant) and several friends went to Honeysuckle Rock for the purpose of swimming. Claimant had been to the area a number of times in the past. At some point, claimant grabbed the rope and successfully swung out into the water. Claimant decided to use the rope again, but this time chose to take a running start so that he could swing farther out into the water. As claimant approached the rope, he slipped or tripped and was unable to grasp the rope. His momentum carried him over the bank and he fell head first onto the rocks below. As a result of the fall, claimant suffered a severe laceration to his head and a spinal cord injury which rendered him a permanent quadriplegic.

In September 1982, claimant and his parents commenced this action against the State alleging that the State was negligent in knowing that a dangerous condition existed on its land and failing to correct the condition or to warn users of the condition. A bifurcated trial was conducted. Initially, the Court of Claims found that the State was liable for claimant's injuries. The Court of Claims further found that claimant's conduct contributed to his injuries and apportioned culpable conduct 75% against the State and 25% against claimant. After a separate trial on damages, the Court of Claims found claimant's damages to be $6.05 million and his mother's to be $150,000. After apportionment, judgment was entered in the amount of $4,537,500 for claimant and $112,500 for his mother. The State has appealed, challenging both the finding of liability and the calculation of damages.

Negligence consists of a duty of care owed to another and a breach of such duty (see, Pulka v Edelman, 40 NY2d 781, 782). Whether a duty was owed must not be confused with whether any such duty was breached. As a landowner, the State owes the same duty of care as that of a private individual: the duty to exercise reasonable care under the circumstances in main-

taining its property in a safe condition *(see, Kush v City of Buffalo,* 59 NY2d 26, 29; *Basso v Miller,* 40 NY2d 233, 241). It has long been the law of this State that "[t]he risk reasonably to be perceived defines the duty to be obeyed" *(Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 344). Applying these principles to a landowner, the factors to be considered in determining to whom a duty, if any, was owed are the likelihood of injury to another from a dangerous condition or instrumentality on the property and the foreseeability of a potential plaintiff's presence on the property *(Kush v City of Buffalo, supra,* p 30).

■ In this case, the proof indicated that sharp, jagged rocks were below the rope and extended beyond it such that one had to successfully swing out to clear the rocks and reach the water. Expert witnesses testified that this was a dangerous condition. Also, the State was aware that two years prior to this accident, a girl lost her grip on the rope and fell onto the rocks. Further, Honeysuckle Rock was open to the public, albeit not for swimming, and the evidence indicates that the State was aware that people swam there. Since the proof established a likelihood of injury and the foreseeability of claimant's presence on the property, a duty of care arose on the part of the State.

The State's reliance on *Benjamin v City of New York* (64 NY2d 44) to support its claim of no duty is misplaced. Although that decision stated that there was no duty *(supra,* at p 46), a reading of the decision in its entirety, along with the dissenting opinion, indicates that duty was not at issue. The city was found not to be negligent because its failure to provide supervision or construct a locked fence did not constitute a breach of its duty. Similarly, the issue of whether a duty of care existed was foreign to the case of *Cimino v Town of Hempstead* (66 NY2d 709, *affg* 110 AD2d 805). The true issue there was whether such duty was breached by the defendant's failure to warn the plaintiff of a readily observable condition.

Resolution of the issue of breach of duty requires a factual weighing of the severity of potential injuries against the burden on the landowner to avoid the risk *(Kush v City of Buffalo,* 59 NY2d 26, 29-30, *supra).* Here, the potential for severe injuries from a fall from the rope onto sharp, jagged rocks is obvious. Further, the risk could have been avoided by the simple expedient of cutting the tree down. In the face of these facts, the State's actions in simply posting signs and

occasionally cutting down the rope were insufficient to fulfill its duty of care.

Turning to the issue of proximate cause, it is established that a defendant is relieved of liability where, after his negligence, an unforeseeable superseding force intervenes which breaks the chain of causal connection and itself causes the injury (see, Derdiarian v Felix Contr. Corp., 51 NY2d 308, 315). Further, a plaintiff's own conduct may be a superseding force absolving a negligent defendant from liability (see, e.g., Smith v Stark, 67 NY2d 693, 694; Boltax v Joy Day Camp, 67 NY2d 617, 620; Dowd v New York, Ontario & W. Ry. Co., 170 NY 459, 469-470). However, in order to be a superseding cause, a plaintiff's negligence must be more than mere contributory negligence, which would be relevant in apportioning culpable conduct. Rather, such conduct, in addition to being unforeseeable, must rise to such a level of culpability as to replace the defendant's negligence as the legal cause of the accident. In Boltax v Joy Day Camp (supra), for example, the plaintiff dove from a lifeguard chair into a shallow swimming pool. Since the condition of the pool was obvious, it was not foreseeable that the plaintiff would engage in such conduct. Further, the conduct of the plaintiff, an experienced swimmer, was found to be so careless that the defendant was absolved of liability. The instant case is distinguishable. A plaintiff need not demonstrate that the precise manner in which the accident happened was foreseeable (Derdiarian v Felix Contr. Corp., supra). Here, it was not unforeseeable that claimant would possibly attempt to get a running start at the rope, nor that he could have slipped while running at the rope. Also, while claimant's attempt to use the rope in this manner may have been negligent and a contributing cause of the accident, his conduct was not so culpable as to supersede the State's negligence as the cause of the accident. Thus, the State's negligence was the proximate cause of the accident.

Next, the State argues that claimant's assumption of risk bars his action. CPLR 1411 provides that the amount of a plaintiff's damages "shall be diminished in the proportion which the culpable conduct attributable to the claimant * * * bears to the culpable conduct which caused the damages". The phrase "culpable conduct" refers not only to negligent conduct on the part of a plaintiff, but conduct which, for whatever reason, the law deems blameworthy (Arbegast v Board of Educ., 65 NY2d 161, 168). Common law has distinguished between express assumption of risk, which is an "agreement

in advance that defendant need not use reasonable care for the benefit of plaintiff and would not be liable for the consequence of conduct that would otherwise be negligent", and implied assumption of risk, which is "founded not on express contract, but on plaintiff's voluntarily encountering the risk of harm from defendant's conduct with full understanding of the possible harm to himself or herself" *(supra,* at p 169). Express assumption of risk is not a factor in the apportionment of damages, but, unless public policy proscribes the agreement limiting liability, acts as a bar to the action by negating any duty on the part of a defendant *(supra,* at p 170). Implied assumption of risk, on the other hand, is a factor to be considered in ascertaining the culpable conduct attributable to a plaintiff *(supra,* at p 170). In the instant case, there is no suggestion of any express assumption of risk. Clearly, however, the evidence demonstrates implied assumption of risk by claimant. This does not act to bar the claim, but is a factor to be taken into account in ascertaining the proportionate culpable conduct.[1]

██ ██ In our view the Court of Claims did not accurately incorporate claimant's implied assumption of risk into the apportionment of culpable conduct.[2] In a nonjury case, this court has the power to weigh conflicting testimony and inferences that may be drawn from such testimony and can grant the judgment which upon the evidence should have been granted by the trial court *(Arnold v State of New York,* 108 AD2d 1021, 1023, *appeal dismissed* 65 NY2d 723). This includes the power to apportion culpable conduct *(see, Wood v State of New York,* 112 AD2d 612). Here, claimant was well aware of the hazard posed by the position of the rope. Indeed, he had successfully swung on the rope moments before the accident. Further, he was clearly negligent in his approach to the rope. In our view, the culpable conduct which should be attributed to claimant is equal to that which should be attrib-

---

1. The decision of the Court of Appeals in *Maddox v City of New York* (66 NY2d 270) found implied assumption of risk to be a bar because the action accrued prior to September 1, 1975, the effective date of the comparative culpability statute (CPLR 1413). The Court of Appeals found no reasonable basis to modify the common-law bar in that case. The instant action accrued after September 1, 1975 and, therefore, the bar found dispositive in *Maddox* is not applicable.

2. While the State does not specifically argue that the apportionment should be modified, its contention that claimant's implied assumption of risk bars his claim sufficiently raises the argument that the Court of Claims failed to properly account for claimant's implied assumption of risk.

uted to the State. Thus, we hold that liability should be apportioned 50% on the part of the State and 50% on the part of claimant.

■ ■ As a final matter, we agree with the State's position that the damages award is excessive. The Court of Claims found claimant's damages to be $6.05 million, broken down as follows:

| | |
|---|---|
| Net Lost Earnings | $1,500,000 |
| Lost Fringe Benefits | 300,000 |
| Cost of Support Services | 1,300,000 |
| Medical Costs (Future) | 450,000 |
| Pain and Suffering | 2,500,000 |

This being a nonjury case, this court has the authority to find damages where, as here, the record is complete *(see, Koester v State of New York,* 90 AD2d 357, 363-364). We find no reason to disturb the amounts found for the cost of support services and future medical costs. The figure for net lost earnings is excessive, in our view, primarily because of the low value given to possible future earnings.[3] While we realize that future damages cannot be computed with exactitude, we hold that the record supports a net lost earnings figure of $1 million. This would result in a reduction of lost fringe benefits to $200,000.[4] We note that the State argues on appeal that the net lost earnings figure should be reduced by income taxes that would have been paid on such earnings. However, the State offered no evidence at trial to demonstrate the amount that should be deducted. Finally, the record supports an award of $1 million for pain and suffering. Therefore, we find claimant's damages to be $3.95 million. The award of $150,000 to claimant's mother was appropriate in light of evidence of medical expenses incurred by her and the value to her of claimant's services.

MAIN, J. (concurring in part and dissenting in part). I concur with the majority in all respects with the exception of their reduction of claimant's pain and suffering award from $2.5 million to $1 million. In my view, the record does not support such a drastic reduction. I would, instead, reduce such award by no more than $500,000, leaving an award for pain and suffering of $2 million.

---

3. Claimant's expert computed possible future earnings to be 10% of expected earnings.

4. The Court of Claims accepted the opinion of the State's expert that lost fringe benefits should be 20% of net lost earnings.

CASEY, J. (dissenting). My first disagreement with the majority's opinion concerns the breach of duty issue. The State developed, maintained and held its land open solely for use as a public fishing area, and claimant was able to enter the site only because it was so developed, maintained and held open. As found by the Court of Claims, the site was posted with signs expressly designating the area as a fishing area and prohibiting all other uses. Since the permitted use of fishing is one of those uses specified in General Obligations Law § 9-103, the duty of care imposed upon the State is severely limited by the statute (Sega v State of New York, 60 NY2d 183). It is illogical to impose upon the State the far broader standard of reasonable care on the theory that claimant sustained his injuries while actually engaging in an activity not enumerated in General Obligations Law § 9-103. Having gained entry to the land due to the State's development and maintenance of the site for public fishing, and having been duly warned that all other uses were prohibited, claimant cannot broaden the State's duty of care merely by electing to forego the only permitted use and voluntarily engaging in a patently hazardous, prohibited use of the land. The State's failure to raise this issue on appeal does not preclude this court's application of the proper standard of care (see, Sega v State of New York, 89 AD2d 412, affd 60 NY2d 183). Nor should the conclusion be different as a result of the State's awareness of past unpermitted uses of the property. As noted above, the State continued to place signs on the premises restricting its use to fishing and prohibiting all other uses. Short of closing the site off to the public or posting a round-the-clock guard, the State could do little else to restrict the use of its property. Based upon the foregoing analysis, it is my view that the State's duty of care in this case is defined by General Obligation Law § 9-103, a duty which it clearly did not breach (see, Sega v State of New York, 60 NY2d 183, 192-193, supra).

If the State's duty is defined by the standard of reasonable care prescribed in Basso v Miller (40 NY2d 233), rather than by General Obligations Law § 9-103, it is my view that the State did not breach that duty. As noted above, the State developed and maintained the site solely for fishing, and it posted signs prohibiting all other uses. The rocky slope where claimant sustained his injuries was not dangerous to those who used the premises for its only authorized purpose—fishing. The condition was dangerous only to those who sought to enhance the thrill of engaging in the prohibited activity of

swimming by using an inherently perilous method of entering the water. As to those persons, the condition was clearly dangerous upon mere inspection. In fulfilling the duty of reasonable care in these circumstances, the State should not be required to undertake drastic measures,* which would destroy the scenic and natural beauty of the site and perhaps render it unfit for its intended purpose, to prevent a thrill-seeker from knowingly, voluntarily and recklessly engaging in a prohibited, hazardous activity *(see, Bradshaw v Paduano,* 55 AD2d 828). Nor can the State be held liable for failing to warn claimant of the readily observable condition *(see, Cimino v Town of Hempstead,* 66 NY2d 709, *affg* 110 AD2d 805) or for failing to allocate additional police resources to prevent claimant from engaging in the unauthorized, hazardous activity *(see, Evers v Westerberg,* 32 NY2d 684).

Assuming that the State breached a duty of care owed to claimant, reversal is nevertheless required by *Boltax v Joy Day Camp* (67 NY2d 617). In the *Boltax* case, the plaintiff was injured when he dove head first from a lifeguard chair into shallow water in a swimming pool. The *Boltax* plaintiff was an experienced swimmer, knowledgeable about the general dangers of diving and familiar with the various water levels at each part of the pool. Here, too, claimant was an experienced swimmer, capable of understanding the dangers of his actions, knowledgeable about the use of the rope and familiar with the area around the rope, including the condition found by the Court of Claims to be "clearly dangerous upon mere inspection". Despite the realization that claimant must have had as a result of this knowledge, experience and familiarity, and from common sense *(see, Smith v Stark,* 67 NY2d 693), claimant chose to make a reckless running attempt to grab a swinging rope over a steep rocky slope. As in *Boltax,* the tragic result was almost inevitable. On the issue of foreseeability, there is again no real distinction between the circumstances herein and those in *Boltax.* It was no more foreseeable that claimant, with his knowledge and experience, would make a running attempt to grab the swinging rope than that an experienced swimmer, knowledgeable about the dangers of diving, would choose to dive head first from a lifeguard chair into shallow water.

---

* The majority opinion's suggestion that the simple removal of a single tree would have prevented claimant from recklessly engaging in hazardous activity has no support in the record.

On this issue, hindsight should not be used to elevate speculation to the level of reasonable foreseeability. Certainly, it takes little imagination to envision a large number of potential reckless uses of the rope, including the use attempted by claimant. For example, it is not inconceivable that someone might climb the rope and attempt to dive into the water from the tree branch where the rope is attached. The rope could also make an excellent hangman's noose for use in horseplay or in a more serious manner. Does this mean that the State would be liable for any resulting injuries? I think not. *Boltax (supra)* teaches that a reckless act will be considered as a superseding cause although such an act is readily imaginable, for if one were asked to make a list of potential reckless uses to which a lifeguard chair at the edge of a pool could be put, diving would be near the top of that list. It was the *Boltax* plaintiff's knowing and voluntary decision to engage in a hazardous activity that rendered the act reckless and an unforeseeable superseding event. Here, too, claimant's running attempt to grab the swinging rope, while he was fully aware of the dangers facing him if he failed, must be viewed as a reckless and unforeseeable superseding act.

That the sole proximate cause of claimant's injuries is the reckless manner in which he attempted to use the rope is buttressed by the evidence of the prior accident noted in the majority's opinion. The injured party apparently slipped and fell from the rope after having grabbed onto it and swung out from the top of the bank; her injuries were relatively minor. In contrast, claimant herein stumbled as he ran toward the swinging rope and his aborted attempt to propel himself over rocks and into the water caused him to land on his head, among the rocks; he suffered devastating injuries which have left him quadriplegic.

Claimant's plight cries out for sympathy. He was a vigorous, athletic young man, entering the prime of his life. His injuries were the result of a tragic accident and the impact of his quadriplegia cannot be overstated. Nevertheless, the State is not an insurer *(Tripoli v State of New York,* 72 AD2d 823) and its liability to claimant should be determined by applying the basic principles of tort law irrespective of the severity of claimant's injuries. It is my view that based upon these principles, the State is not liable to claimant and, therefore, the judgment should be reversed and the claim dismissed.

WEISS and YESAWICH, JR., JJ., concur with MAHONEY, P. J.;

MAIN, J., concurs in part and dissents in part in an opinion; CASEY, J., dissents and votes to reverse in an opinion.

Judgment modified, on the facts, without costs, by reducing the award to claimant Grayford John Mesick to $1,975,000 and by reducing the award to claimant Patricia A. Mesick to $75,000, and, as so modified, affirmed.