Rose **GEHLING, admx. of the Estate of Earl J. Gehling and the Estate of Earl H. Gehling, and Rose Gehling on her own behalf, Plaintiff,**

v.

**ST. GEORGE'S UNIVERSITY SCHOOL OF MEDICINE, LTD., and Foreign Medical School Services Corp., individually and t/a St. George's University School of Medicine, Defendants.**

No. 86 CV 1368.

United States District Court,
E.D. New York.

Feb. 6, 1989.

---

Shor, Levin & Weiss, P.C., Elkins Park, Pa. (Lawrence D. Levin, of counsel), for plaintiff.

Donald J. Werner, Massapequa Park, N.Y., for defendants.

## AMENDED MEMORANDUM AND ORDER

BARTELS, District Judge.

This is the second chapter of a case that arose from the collapse of Earl Gehling after crossing the finish line while participating in a "road race" on the Island of Grenada on April 18, 1982. Gehling was a student at St. George's University School of Medicine ("SGU"). Rose Gehling, decedent's mother, instituted this action as administratrix of her son's estate, on her own behalf, and also on behalf of her deceased husband's estate. The facts and background of the case have previously been set forth in *Gehling v. St. George Univ. School of Medicine*, 698 F.Supp. 419 (E.D.

N.Y.1988), familiarity with which is hereby assumed. The case was originally brought in Pennsylvania and those actions now before this Court concern events occurring solely in Grenada. This Court has previously determined that the plaintiff has waived all rights to a jury trial by failing to demand same. (Order of 6/14/88)

Following the Order in the prior case of October 12, 1988 there remained before this Court the issues of: 1) negligence in the conduct of the road race; 2) medical malpractice and negligence at the race site and at the Grenada General Hospital; and 3) negligence in the context of an unauthorized autopsy.

Upon these issues an eight day bench trial was held before the Court on October 13, 14, 17, 18, 19, 20, 21 and 24, 1988, consisting largely of video tapes. During the course of the proceedings the Court dismissed the claim of the unauthorized autopsy.

The Court has considered all of the evidence offered at trial, including eyewitness testimony, expert testimony by several doctors, and testimony from student sponsors. Predicated upon the evidence and the law the Court makes the following findings of fact and conclusions of law, and accordingly dismisses the remaining causes of action.

### FINDINGS OF FACT

1. On April 18, 1982 Earl Gehling ran in a race of approximately 2.5 miles on the island of Grenada, West Indies which began on a public road in front of the "True Blue" campus of the St. George's University Medical School and finished on the "Grand Anse" campus of the same school. Most of the territory covered by the race was on public roads in between the two campuses. The race took place in the late afternoon when the temperature was hot, approximately 80–85 degrees Fahrenheit and the humidity was high. More than one hundred runners participated in the "fun run" including medical students, Vice Chancellor Dr. Geoffrey Bourne, members of the faculty of the Medical School and their families, Grenadians, and some children.

2. SGU's business administrator, Gary Sollin, followed the runners in a school vehicle equipped with oxygen and was prepared to pick up runners who faltered. Approximately half way through the race, water was available to runners at a spigot alongside the road.

3. The race itself was a regular SGU event, called either "St. George's University School of Medicine's BiAnnual Road Race" and/or "True Blue Road Race" and it was organized by several students at SGU with SGU's full knowledge and consent. The road race had taken place twice a year for at least two, perhaps three, years prior to the date in question.

4. SGU publicized this bi-annual school race in its annual school newsletter which was part of its regular official publications which was fully controlled and edited by high-level administrators at SGU including Vice Chancellor Dr. Geoffrey Bourne.

5. The race was organized by Fred Tilden, a medical student. The business manager of SGU, in response to a request by the student organizer, gave some money from the School's student activity funds to pay for T-shirts and trophies for the participants. The student entrants paid an entrance fee.

6. SGU did not organize, supervise or control the road race. The race was organized, supervised and controlled by students at SGU on their own initiative.

7. No doctor or ambulance or provisions including ice and towels were furnished *by SGU* at the finish line. However, at the finish line there was water, ice, and towels soaked in cold water provided by the students. In addition, medical students who had been trained as physicians assistants were stationed at the finish line.

8. At the time of the race Gehling was 25 years old, stood 5'10" tall and was approximately 75 pounds overweight. He suffered from high blood pressure, also known as hypertension (Plaintiff's Exhibit #30, Dr. Lewis Druffner's records illustrating decedent's history of elevated blood pressure readings), and the left ventricle of his heart was hypertrophied, or enlarged.

A person with hypertension which is not being treated is at great risk of developing fatal left ventricular hypertrophy which can lead to a heart attack. Gehling was athletic, participating in many sports activities including basketball and weight lifting, and he practiced jogging before the race. These activities were done under similar weather conditions as existed at the time of the race at issue. According to the toxicological report prepared in Pennsylvania after the race, Gehling had taken, before the race, ephedrine which is an amphetamine-like substance that speeds the heart rate.

9. Gehling, as an advanced medical student, knew or should have known of the potential consequences of ingesting amphetamine-like drugs and that he had borderline hypertension.

10. Gehling was fully familiar with the climate on the island of Grenada and with the quality of medical care available there.

11. Overweight persons are more susceptible to heat exhaustion and heat stroke; accordingly his obesity was a contributing factor in his suffering from exposure to heat.

12. The race began about 4 P.M. and ended around 5 P.M. It took Gehling approximately ½ hour to finish the race. After he crossed the finish line on the Grand Anse Campus he collapsed and lost control, becoming combative, irrational and refusing the assistance offered him. He fell and then struggled up and fell again. It became necessary to restrain him because of his hysterical behavior. Accordingly, fellow medical students attempted to control him by wrestling him to the ground. He was then moved into shade where ice and wet towels were applied to his body in an attempt to cool him down. In this connection a hose was used and cups of water were also available at a nearby snack bar.

13. Other participants who found themselves adversely affected by the heat or fatigued by the run dropped out of the race before the finish line or stopped running and just walked the rest of the course.

14. At the finish line a blood pressure cuff was also available and used. Gehling was attended by several fellow students some of whom had training in emergency medicine and also by Dr. Biddy Pole, a physician who worked at St. George's Hospital and who was married to an SGU professor. A visiting professor, Dr. Cyrus, further attended to Gehling at the finish line. Those in attendance attempted to give Gehling oxygen.

15. After 15–20 minutes in the shade near the finish line Gehling was carried by several students to the nearby office of Dr. Davidheiser in the anatomy laboratory which was air conditioned. Efforts to cool Gehling were continued. Blue ice packs were placed under his arms and in his groin. His blood pressure was taken and those present attempted to give him oxygen. Someone called for an ambulance. Gehling's level of consciousness continued waning and fading until he became fully unconscious.

16. After approximately 15 to 20 minutes in Dr. Davidheiser's office Gehling was transferred by ambulance to St. George's General Hospital ("Hospital"). The ride in the ambulance to the Hospital took 15 minutes. The Hospital is owned and controlled by the government of Grenada. SGU has one representative on the 18–member board of the Hospital which it uses for some of its clinical work. SGU has donated to the Hospital two ambulances as well as medications and medical equipment. The Court finds that it was approximately 6 P.M. when Gehling arrived at the Hospital.

17. At the Hospital Gehling's treatment included ice packs to bring down his body temperature, valium to control his convulsions, intravenous fluids to cool his body, EKGs to monitor his heart, and, as a last attempt to revive him, epenephrine was injected directly into his heart. Gehling was comatose from shortly after his collapse until his death.

18. Despite this treatment Gehling was declared dead at the Hospital at 12:45 A.M. on April 19, 1982.

19. No physicians employed by SGU as teachers or in any other capacity rendered

medical care or services to Gehling at the Hospital.

20. Heat stroke is frequently a fatal disorder even when immediate and appropriate therapy is given. And there is no sufficiently credible evidence to indicate that any treatment of Gehling after he collapsed at the finish line would have enabled him to survive.

21. According to records from Grenada, Gehling died from a perforated gastric ulcer which led to irreversible shock. This Grenadian "autopsy" report was signed by Dr. Pole though there was evidence that she did not perform the autopsy herself.

22. When Gehling's body arrived in Pennsylvania Dr. James O'Connor was hired by Gehling's family to perform a full autopsy. He concluded that Gehling died of "cardiac arrest associated with hypertrophy of the left ventricle of the heart, subendocardial fibrosis, and microscopic evidence of myofibrillary degeneration of the cardiac fibers in the left ventricle." He went on to state that the "enciting factor ... was related to the 2½ mile race which he had just completed under tropical conditions in the Island of Grenada." The Court adopts this diagnosis of the cause of Earl Gehling's death.

23. The Court does not accept the testimony or opinions of Doctors Edward Burka and John Sutton who concluded that Gehling's past medical history did not play any role in his cardiovascular collapse on April 18, 1982. Based upon credible expert testimony the Court finds that Gehling suffered from high blood pressure, obesity, and an enlarged left ventricle and that under the circumstances heat exhaustion led to heat stroke which itself caused Gehling's death.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties by virtue of a complete diversity of citizenship in accordance with 28 U.S.C. Section 1332 and an amount in controversy in excess of $10,000 exclusive of costs, the Court specifically concluding that plaintiff's decedent was a citizen and domiciliary of the Commonwealth of Pennsylvania at the time of his demise and St. George's U.

School of Medicine was a Grenadian corporation doing business within the state of New York and was amenable to jurisdiction and was properly served.

2. Plaintiff, Rose Gehling, is the administratrix of the estate of Earl J. Gehling, plaintiff's decedent herein, by reason of having been so appointed by the Register of Wills in and for the County of Lackawanna on the 17th day of January 1983, Commonwealth of Pennsylvania.

3. SGU is a corporation incorporated pursuant to the laws of the island nation of Grenada, having its principal place of business in Grenada.

4. The purpose of SGU's incorporation was to act as a business providing all facets of medical education and related services to qualified students, including Gehling.

5. On April 18, 1982 and for sometime prior thereto, plaintiff's decedent, Earl Gehing, was a duly admitted student at SGU.

6. The Court has previously determined that the law of the State of New York on all issues of liability shall be applied as set forth in its Order dated October 12, 1988 which is fully incorporated herein by reference.

7. Plaintiff's decedent died on the island of Grenada in the St. George's General Hospital on April 19, 1982 and is survived at the present time by his sister, Maryrose Holmes, and his mother, Rose Gehling.

8. Under New York law it is well-established that a defendant may be found liable for negligence only if a duty exists, the breach of which is the proximate cause of the plaintiff's injury. *Palsgraf v. LIRR*, 248 N.Y. 339, 342, 162 N.E. 99 (1928).

9. There is a distinction between sponsoring an event and being responsible for any actions which take place. See *Vogel v. West Mountain Corp.*, 97 A.D.2d 46, 470 N.Y.S.2d 475 (3 Dept.1983).

10. In this instance medical students of SGU were the sponsors of the race and responsible for its conduct. SGU was only a sponsor of the race, not responsible for the conduct thereof.

### A. No Negligence

11. Although it knew of the race, SGU did not control, monitor or supervise any aspect of the road race. Nor did it owe Gehling a duty to control, monitor or supervise the race. Even if SGU did "sponsor" the race, for liability to attach, SGU must have had "sufficient control over the event to be in a position to prevent negligence." *Vogel v. West Mt. Corp.*, 97 A.D.2d 46, 48, 470 N.Y.S.2d 475, 477 (1983). This it did not have. As the owner and/or occupier of the land on which the race began and ended, SGU had a duty to exercise reasonable care under the circumstances and to prevent injury to people on its property. *Id.* This it did.

12. The race was run in part on SGU's property with its knowledge and approval. SGU funded the purchase of T-shirts and trophies, and some of its employees participated in the race. SGU was responsible to exercise the necessary care to see that nothing on its property, at the beginning or the end of the race, could cause an injury to the runners. There was no evidence that the property was dangerous or not in a safe condition. The students who organized the race were responsible to exercise due care under the circumstances during the entire race including the end of the race. SGU was not.

13. The American College of Sports Medicine Position Stand on "The Prevention of Thermal Injuries During Distance Running," which provides guidelines on what medical provisions should be available during races, is not applicable to the race at issue. These guidelines apply only to races of at least 10 kilometers (2.6 miles) and therefore not to this race.

14. In a short race of 2.5 miles run in tropical environmental conditions some type of assistance should be provided for the runners at the end of the race, in this instance, primarily by the students of SGU. The availability of water, ice, oxygen and wet towels at the finish line, coupled with the stationing there of medical students with some emergency training, was sufficient to satisfy this duty of care. In view of the short distance of the race it was not necessary to have a doctor and special provisions for emergency, such as intravenous capability, at the Grand Anse campus. The Court does not credit the testimony or opinions of Doctors Burka and Sutton to the effect that the presence of doctors who could administer intravenous treatment at the end of the race would have saved the life of the decedent.

15. None of the persons who rendered medical treatment to Gehling following his collapse was an employee or agent of SGU. Accordingly, SGU is not vicariously liable for any medical malpractice or negligence of such persons nor is there any evidence of the same.

16. Plaintiff has failed to meet its burden of proving by a preponderance of the evidence that there was any negligence on the part of SGU in the conduct of the race.

### B. No Causation

17. Moreover, even if SGU had a duty to control, monitor or otherwise supervise the race its failure to do so would not be the proximate cause of Gehling's death.

18. Plaintiff has failed to meet its burden of proving by a preponderance of the evidence that SGU was guilty of any medical malpractice or negligence. It is also true that the negligence or malpractice, if any, of SGU or any of the persons who treated Gehling prior to his removal by ambulance was not the proximate cause of any of his injuries.

19. Gehling's death was caused by his physical condition—his being overweight, having hypertension, taking ephedrine and his hypertrophied left ventricle—and the circumstances under which the race was run. See *Sprayregen v. American Airlines*, 570 F.Supp. 16, 17 (1983).

### C. Assumption of Risk

20. New York has enacted a pure comparative negligence statute, N.Y. CPLR, Article 14-A, §§ 1411-1413. But assumption of risk is still relevant as a factor to be taken into account in determining the proportion of culpable conduct. *Mesick v. State of New York*, 118 A.D.2d 214, 219,

504 N.Y.S.2d 279, 282 (3 Dept.1986). The New York Court of Appeals has said:

> The doctrine has been divided into several categories but as the term applies to sporting events it involves what commentators call 'primary' assumption of risk. Risks in this category are incidental to a relationship of free association between the defendant and the plaintiff in the sense that either party is perfectly free to engage in the activity or not as he wishes. Defendant's duty under such circumstances is a duty to exercise care to make the conditions as safe as they appear to be. If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty.

*Turcotte v. Fell,* 68 N.Y.2d 432, 438–9, 510 N.Y.S.2d 49, 53, 502 N.E.2d 964, 968 (1986)

■ 21. A university which undertakes to be responsible for or to control an athletic event has the duty to exercise reasonable care under the circumstances to prevent injury to those who engage in the athletic event which it controls. "Intramural sporting activities involve inherent dangers to participants. This claimant, in electing to play, assumed the dangers of the game.... The State was required only to act reasonably in providing a field of play for claimant." *Scaduto v. State of New York,* 86 A.D.2d 682, 683, 446 N.Y.S.2d 529, 530 (3 Dept.1982). So here Gehling entered the race voluntarily and assumed the dangers of the race.

22. In assessing liability a court may take into account that prior sporting events had taken place at the scenario without incident and also the age of the university students. See *Mintz v. State of New York,* 47 A.D.2d 570, 362 N.Y.S.2d 619 (3 Dept. 1975). See also *Mesick v. State of New York,* 118 A.D.2d 214, 504 N.Y.S.2d 279 (3 Dept.1986).

23. The decedent, being a 6th semester medical student, is charged with knowledge of his own condition and of the tropical conditions of the Island, and by entering the race he assumed the risk of thermal injury under the circumstances including the risk of suffering heat prostration and/or heat stroke.

### D. No Liability for St. George's Hospital Personnel

■ 24. St. George's General Hospital is owned and controlled by the government of Grenada. SGU has one representative on the 18–member board of the Hospital. SGU uses the Hospital to train its students, but does not control the Hospital. Therefore, SGU cannot be held vicariously liable for any negligence or medical malpractice by any persons employed by the Hospital who treated Gehling.

■ 25. Further, plaintiff failed to meet its burden of proving that any of Gehling's injuries was proximately caused by negligence or medical malpractice of any person acting at the hospital.

26. Plaintiff has failed to adduce any evidence of negligence attributable or chargeable to SGU in conjunction with the autopsy performed on Gehling's body in Grenada.

27. In sum, the Court finds: 1) that in connection with the race there was no negligence on the part of SGU; 2) that Gehling's death was not caused by any negligence on the part of SGU, but was caused by Gehling's voluntarily entering the race while in poor physical condition; 3) that he assumed the risk of his own death; and 4) that SGU was not guilty of any malpractice in connection with the treatment of Gehling at the end of the race or at the Hospital.

■ As indicated in the prior opinion, the plaintiff has asserted numerous claims including battery on a corpse, medical malpractice and negligence in the ambulance, a time-barred wrongful death action, strict products liability and Foreign Medical School Services Corp.'s liability, some of which were without merit, but which, nevertheless consumed considerable amounts of the defendant's and the Court's time and resources. Accordingly, the Court does hereby award costs to the defendant involved in the above-entitled mat-

ter pursuant to Rule 54(d) of the Federal Rules of Civil Procedure.

Judgment to be entered accordingly.