[866 NYS2d 711]

Barbara Lapidus, Appellant, v State of New York, Respondent. (Claim No. 11034.)

Second Department, October 28, 2008

84

### APPEARANCES OF COUNSEL

*Seiff Kretz & Abercrombie*, New York City (*Charles D. Abercrombie* and *Mariana Olenko* of counsel), for appellant.

*Andrew M. Cuomo, Attorney General*, New York City (*Peter H. Schiff* and *Michael S. Buskus* of counsel), for respondent.

### OPINION OF THE COURT

ENG, J.

It has often been observed that the concept of proximate cause is an elusive one, incapable of being precisely defined to cover all situations. This appeal calls upon us to consider principles relating to both proximate cause and superseding causation in order to determine whether the State can be held liable for allegedly negligent acts committed by court employees in the course of performing their everyday, ministerial duties. The claimant alleges that these negligent acts caused her to be wrongfully adjudicated a second felony offender based upon a nonexistent assault conviction. The claimant further alleges that this wrongful adjudication resulted in her being sentenced as a second felony offender and that her sentence of imprisonment, when calculated by the New York State Department of Correctional Services, was further improperly enhanced when the sentence for the nonexistent assault conviction was added consecutively to her sentence as a second felony offender. The Court of Claims dismissed the claim, concluding that the claimant's intervening act of failing to controvert the predicate felony offender statement filed against her was the superseding cause of her injuries. For the reasons that follow, we find that the Court of Claims erred in determining the issue of causation as a matter of law, and that the issues of whether the State's alleged negligence was a proximate cause of the claimant's injuries, and whether her conduct was a superseding cause, should await resolution at trial. Accordingly, neither the

claimant nor the State should be awarded summary judgment at this juncture.

The claimant Barbara Lapidus, who is now 54 years old, has a long history of drug abuse and a lengthy criminal history, consisting primarily of drug-related offenses. Lapidus dropped out of school in the seventh or eighth grade because she was having problems at home, and began using speed and heroin as a teenager. Following a stay in a rehabilitation facility in the late 1970s, Lapidus was able to stop using drugs for a period of about nine years. However, toward the end of 1987, after both of her parents became seriously ill and passed away, Lapidus began misusing the valium pills which had been prescribed to her for depression and insomnia. Her drug use then escalated to include heroin.

On November 14, 1987, Lapidus, who was then known as Barbara Silver, was arrested with a codefendant, Ruben Silva, on charges, inter alia, of assault, burglary, and robbery. According to Lapidus, at the time of this offense, Silva was her boyfriend. The victim of the offense was a former boyfriend Lapidus had ended a relationship with several months earlier. Lapidus and the victim lived in the same apartment building in Brooklyn, and she claims that the assault was precipitated when she and Silva encountered the victim in the building's lobby, and the two men exchanged words. The exchange became heated, and culminated with Silva pushing the victim into the victim's apartment, and stabbing him with a kitchen knife.

On November 16, 1987, two days after her arrest, Lapidus was arraigned in the Criminal Court of the City of New York and released on her own recognizance. She and Silva were subsequently charged, in a 12-count indictment, with multiple offenses including assault in the second degree. When Lapidus failed to appear for arraignment on the indictment, a bench warrant was issued. Silva was thereafter arraigned on the indictment on April 5, 1988, and he alone proceeded to trial in December 1988. At the conclusion of Silva's trial, the jury found him guilty of assault in the second degree and, on January 9, 1989, he was sentenced to an indeterminate term of $1\frac{1}{2}$ to $4\frac{1}{2}$ years of imprisonment. Although Lapidus did not participate in the trial and was not tried in absentia, a part clerk mistakenly recorded on the court file jacket that she had been found guilty of the identical charge and sentenced on the same date as Silva. This incorrect information was entered into the court's computer system, and was reported to the New York State Division

of Criminal Justice Services (hereinafter DCJS), the agency responsible for maintaining the criminal histories of individuals arrested in this state. Thus, the purported 1989 assault conviction became part of Lapidus's criminal record.

In the years following her November 1987 arrest for the assault of her former boyfriend, Lapidus was arrested 14 additional times, and convicted of a number of misdemeanor offenses and violations. For a period of approximately 10 years between 1987 and 1997, Lapidus claims that her drug habit spiraled out of control to such a degree that she ended up living in a subway tunnel on the Lower East Side, and supporting herself through prostitution. At one point in early 1996, she became so ill that she sought medical treatment at a free clinic, and learned that she was five months pregnant. Although she stopped using drugs for the remainder of her pregnancy, after the birth of her child, Lapidus once again began using heroin and cocaine, and funding her drug habit through prostitution.

On August 25, 1997, Lapidus was arrested and subsequently indicted in New York County for criminal sale of a controlled substance in the third degree. Following a jury trial, she was convicted of the charged offense. Prior to sentencing, the People filed a predicate felony statement (see CPL 400.21 [2]) alleging that on January 9, 1989, Lapidus had previously been convicted of the felony of assault in the second degree in Kings County. When Lapidus appeared for sentencing on the New York County indictment on January 13, 1998, she was arraigned on the predicate felony statement, and advised of her right to controvert any of the allegations in the statement and to challenge the constitutionality of her alleged prior conviction. However, when asked if the allegations set forth in the predicate felony offender statement were true, Lapidus answered "[y]es," and stated that she did not wish to challenge the constitutionality of her prior conviction. She was then adjudicated a second felony offender and was sentenced, in accordance with the prosecutor's recommendation, to a term of $4\frac{1}{2}$ to 9 years of imprisonment. The sentence imposed was the minimum permissible term for a second felony offender convicted of a class B felony (see Penal Law 70.00 [3] [b]).

Upon being sentenced, Lapidus was transferred to the custody of the New York State Department of Correctional Services (hereinafter DOCS) at the Bedford Hills Correctional Facility (hereinafter Bedford Hills). Shortly after Lapidus arrived at Bedford Hills, DOCS employees reviewed her criminal history,

which included the purported 1989 conviction erroneously reported to DCJS. By letter dated March 11, 1998, Bedford Hills' inmate record coordinator asked the Clerk of the Kings County Supreme Court to forward the commitment order relating to the purported 1989 conviction. In response to this inquiry, on April 3, 1998, a sentence clerk prepared a "duplicate" commitment order, and forwarded it to DOCS. The "duplicate" commitment order indicated that Lapidus had been convicted of assault in the second degree on January 9, 1989, and sentenced to an indeterminate term of $1^{1}/_{2}$ to $4^{1}/_{2}$ years of imprisonment.

On April 10, 1998, DOCS, relying upon the duplicate commitment order, calculated the total term of imprisonment that Lapidus would be required to serve and included the term of $1^{1}/_{2}$ to $4^{1}/_{2}$ years purportedly imposed upon her for the 1989 assault conviction. Upon adding this apparently undischarged term to the term imposed for Lapidus's 1998 drug conviction, the DOCS determined that the total term of imprisonment that she would be required to serve was 6 to $13^{1}/_{2}$ years.

Between May 12, 2003 and August 11, 2003, Lapidus wrote a number of letters to various individuals and agencies inquiring about her status with respect to her alleged 1989 Kings County conviction, and whether the term of imprisonment which had supposedly been imposed upon that conviction should run concurrently rather than consecutively to the term imposed for her 1998 drug conviction. At some point, Lapidus obtained assistance from a legal clinic operated by the Columbia University Law School. According to Lapidus, it was the inquiries made by two of the clinic's dedicated law students that led the Kings County Supreme Court Criminal Term Clerk's Office to conclude, in April 2004, that an error had been made, and that she had never been arraigned, convicted, and sentenced on the 1987 charges that resulted in her purported 1989 conviction. She was thereafter arraigned on the 1987 indictment on April 20, 2004. A few days later, on April 29, 2004, Lapidus pleaded guilty to assault in the second degree, and was sentenced to a term of 10 days of imprisonment. On May 4, 2004, she was resentenced, nunc pro tunc, on her 1998 conviction of criminal sale of a controlled substance in the third degree, to an indeterminate term of 1 to 3 years of imprisonment as a first time offender. Lapidus was released from custody that same day, having been imprisoned for more than six years.

About eight months after her release, Lapidus filed the instant claim against the State, essentially alleging that the

negligence of state employees had caused her to be incarcerated for more than five years longer than she should have been. More specifically, she alleged that due to the negligence and carelessness of employees of the Unified Court System (hereinafter court employees), records were created which erroneously indicated that she had been convicted of assault in the second degree and sentenced to a term of $1^1/2$ to $4^1/2$ years of imprisonment, and that based upon these negligently prepared records, she had been improperly adjudicated a second felony offender, and required to serve a portion of the nonexistent $1^1/2$ to $4^1/2$ year sentence. During the course of discovery, depositions were conducted of the part clerk who made the entries mistakenly indicating that Lapidus had been convicted of assault in the second degree and sentenced in 1989, and of the sentence clerk who prepared the duplicate commitment order upon which DOCS relied in calculating Lapidus's sentence. The part clerk acknowledged that although only Ruben Silva went to trial and was convicted under the 1987 indictment, in the disposition section of the court file, he entered the guilty verdict on the line designated for Barbara Silver. He further indicated that this was "just a clerical mistake," and that having entered the verdict on the wrong line, he repeated the error in recording the sentence. The sentence clerk explained that commitment orders were prepared by part clerks in the courtroom when a criminal defendant was sentenced. She testified that upon receiving a request for a copy of a commitment order such as the 1998 request from Bedford Hills, her practice was to order the court file, and check the court computer system. However, she knew that she had not reviewed the court file in responding to the 1998 inquiry because, had she done so, she would have known that Lapidus had not been sentenced.

Lapidus also appeared for a deposition, and was questioned extensively about her history of drug abuse, criminal record, and failure to controvert the predicate felony offender statement filed against her in 1998. With respect to her 1987 arrest, she maintained that when she was released on her own recognizance, she did not recall being given a date to return to court. Although she wasn't sure how the assault charge against her had been resolved, in the back of her mind she thought it was a possibility that she had been tried in absentia and convicted. At the time of her arrest for criminal sale of a controlled substance in 1997, she was using cocaine, crack, and heroin. She described herself as having been "very sick" during

the trial and at sentencing on the criminal sale charge, explaining that she was "[s]ick from the abuse [she] had done to [her] body on the streets, from the crack, from the heroin. [She] was emaciated . . . [She] was being checked out for all kinds of stuff. [She] had been given medication that [her] whole body broke out in hives and rashes." When questioned about her failure to controvert the second felony offender statement filed against her in 1997, Lapidus testified that "somewhere along the way . . . I got it in my head that I could be convicted in absentia without being there. I figured if I said something at this point that they would just add so much more time to the sentence I was already being given." Lapidus added that it "didn't connect in my head that I was getting so much more time as a predicate than as a first time felon."

After discovery had been completed, Lapidus moved for summary judgment on the issue of liability, arguing that through a series of failures of care and omissions, court employees had prepared state records that resulted in her incarceration for a crime of which she had never been convicted, and an increased term of imprisonment for a crime of which she had been convicted. In this regard, she contended that the part clerk's careless entries on the court file had resulted in the erroneous reporting that she had been convicted of assault in the second degree and sentenced for that offense in 1989, and that the sentence clerk's negligent preparation of a duplicate commitment order, without consulting the court file, had caused DOCS to add the nonexistent sentence imposed for her alleged conviction in calculating the total amount of time she was required to serve. Lapidus further maintained that DOCS employees had compounded the initial negligence of the court employees with their own failures to properly investigate inquiries concerning her status.

The State countered by cross-moving, inter alia, for summary judgment dismissing the claim. In support of the cross motion, the State argued that the claim should be dismissed for a number of reasons, including governmental immunity and lack of a duty of care. The State further maintained that it could not be held liable for the alleged negligence of its employees because Lapidus's own conduct was the proximate cause of her extended incarceration. In this regard, the State emphasized that Lapidus was afforded an opportunity to challenge the validity of her alleged 1989 conviction when she was arraigned on the predicate felony offender statement in 1998, and that she candidly

admitted at her deposition that she had failed to do so because she felt that if she informed the judge that she had not gone back to court on the assault, more time would be added to her sentence beyond the 4½ to 9 year minimum sentence for a predicate felon. The State maintained that Lapidus's 1998 admission that she was a predicate felon was the unforeseeable superseding cause of her additional imprisonment. In support of the cross motion, the State also submitted the affidavit of a Bureau Chief employed by the New York County District Attorney, who averred that it was the practice of his office to further investigate the existence of a prior felony only if a criminal defendant raised a challenge to that conviction. While the summary judgment motions were still pending, the State submitted a second affidavit from the same Bureau Chief, who additionally explained that when a defendant contested predicate felony status, it was the practice of his office to conduct an investigation which included obtaining the minutes of any relevant proceedings.

The Court of Claims denied Lapidus's motion for summary judgment on the issue of liability, and granted that branch of the State's cross motion which was for summary judgment dismissing the claim. In reaching its determination, the court found that Lapidus had made a showing that some or all of the alleged acts of negligence committed by nonjudicial court personnel were ministerial in nature, and thus not protected by governmental immunity. The court further noted that Lapidus had made a strong showing that the part clerk who entered the incorrect information in her court file in 1989 had failed to use that degree of care which a reasonably prudent person would have used under the circumstances. Moreover, assuming the existence of a duty, the court found that Lapidus had also made a showing that the sentence clerk who issued the duplicate commitment order had failed to use reasonable care. However, even assuming that a foreseeable consequence of the erroneous entry of conviction in 1989 would subject Lapidus to sentencing as a second felony offender, the court concluded that her failure to controvert the predicate felony statement filed against her was an intervening and superseding act that severed the causal chain between the State's alleged negligence and her injuries. In this regard, the court emphasized that had Lapidus controverted the allegation that she had been convicted of a felony in 1989, a hearing would have been held at which the burden of proof beyond a reasonable doubt would have been on the People.

Lapidus now appeals.

We begin our analysis of whether the State can potentially be held liable with the threshold issue of whether the alleged acts of negligence committed by the state employees are cloaked with immunity. More than 75 years ago, the State surrendered its sovereign immunity for the negligence of its employees when it enacted the Court of Claims Act (*see* Court of Claims Act § 8). Nevertheless, "other recognized limitations still govern the tort liability of municipal officers" (*Tango v Tulevech*, 61 NY2d 34, 40 [1983]), including governmental immunity, which attaches where the alleged negligent conduct giving rise to the claim involves a discretionary act requiring the government employee to exercise reasoned judgment (*see Lauer v City of New York*, 95 NY2d 95, 99 [2000]; *Mon v City of New York*, 78 NY2d 309, 313 [1991]).

The doctrine of governmental immunity does not, however, shield the State from liability for an employee's negligent performance of his or her ministerial duties (*see Lauer v City of New York*, 95 NY2d at 99; *Tango v Tulevech*, 61 NY2d at 40-41). Thus, appellate courts have held that the State is not immune from liability for the negligent acts of court employees in performing their everyday, ministerial duties. For example, a judgment against the State was upheld in *National Westminster Bank, USA v State of New York* (155 AD2d 261 [1989], *affd* 76 NY2d 507 [1990]), where the Bronx County Clerk, acting in his role as Clerk of the Supreme Court, failed to timely docket a judgment obtained by the claimant in Nassau County. As a result of the Clerk's failure to properly record the judgment, the judgment debtor was able to convey his parcel of land in the Bronx free from the claimant's lien. In affirming the judgment in favor of the claimant, the Appellate Division, First Department, reasoned, inter alia, that the State was not insulated from liability for the Clerk's negligent failure to properly and timely record the subject judgment because the recording of judgments was a ministerial act.

A judgment in favor of a claimant was also affirmed in *Marx v State of New York* (169 AD2d 642 [1991]), where Housing Court clerks, unable to locate a court file, caused the issuance and execution of a warrant of eviction based on recreated papers, even though a subsequent order had vacated the judgment of eviction. The Appellate Division, First Department, concluded that the State had properly been held liable for both the loss of the file and subsequent failure to alert the marshal,

once the file was recovered, that the dispossess petition had been dismissed.

More recently, in *Hunt v State of New York* (36 AD3d 511 [2007]), the First Department reversed a judgment dismissing a claim brought by a former inmate who was sexually assaulted after court officers failed to alert DOCS of a judge's directive that the claimant be held in protective custody. The evidence presented at trial demonstrated that court officers were responsible for recording directives to hold an inmate in protective custody on the securing orders they gave to DOCS' employees. In finding in favor of the claimant on the issue of liability, the court concluded that the court officers assigned to the part where the protective custody directive had been issued did not adhere to the governing standard regarding the transmission of such directives to DOCS, and that their failure to perform this ministerial function subjected the State to liability.

Here, the primary acts of negligence alleged to have resulted in Lapidus's erroneous adjudication as a second felony offender were committed by the part clerk, who incorrectly recorded both the jury verdict against Silva and the sentence imposed upon him on the line of the court file designated for Lapidus. Since the accurate recording of a verdict rendered by a jury and a sentence imposed by a court do not require the conscious exercise of discretion, these duties are ministerial in nature, and the State may not be shielded from liability for the negligent performance of them. Similarly, the sentence clerk who later prepared a duplicate commitment order for the sentence purportedly imposed in 1989 without consulting the court file, which would have revealed that only Silva went to trial and was sentenced in 1989, was also performing a ministerial duty, for which the State may not be immunized.

Although "ministerial negligence" is not cloaked with immunity, it does not automatically provide a basis for the imposition of liability (*Lauer v City of New York*, 95 NY2d at 99; *see Tappan Wire & Cable, Inc. v County of Rockland*, 7 AD3d 781, 782-783 [2004]). "Rather, a ministerial wrong 'merely removes the issue of governmental immunity from a given case' " (*Lauer v City of New York*, 95 NY2d at 99, quoting *Lauer v City of New York*, 258 AD2d 92, 111 [1999]). Thus, to hold the State liable for negligence, a claimant must establish the elements of a negligence claim, which are the existence of a duty, a breach of that duty, and that such breach was a proximate cause of the events which produced the injury (*see Pulka v Edelman*, 40

NY2d 781, 782 [1976]; *Pironti v Leary*, 42 AD3d 487, 489 [2007]; *Coral v State of New York*, 29 AD3d 851 [2006]; *Vetrone v Ha Di Corp.*, 22 AD3d 835 [2005]). With regard to the issue of duty, case law demonstrates that court employees have a duty to exercise due care in performing their ministerial duties, and that there is "ample authority for imposing liability upon the State based upon the negligent performance of a ministerial act" (*Boland v State of New York*, 218 AD2d 235, 245 [1996]; *see Hunt v State of New York*, 36 AD3d 511 [2007]; *Marx v State of New York*, 169 AD2d 642 [1991]; *National Westminster Bank, USA v State of New York*, 155 AD2d 261 [1989], *affd* 76 NY2d 507 [1990]; *Stewart v State of New York*, 18 Misc 3d 236, 239 [2007]; *Schwandt v State of New York*, 4 Misc 3d 405, 410 [2004]). Indeed, the negligence of court employees formed the basis for imposing liability upon the State in the three cases discussed above in connection with the issue of governmental immunity: *National Westminister*, where the Bronx County Clerk failed to timely docket a judgment, *Marx*, where Housing Court clerks caused the issuance of a warrant of eviction based on recreated papers, and *Hunt*, where court officers failed to transmit to DOCS a directive that an inmate be held in protective custody. Accordingly, the alleged failure of court employees in this case to exercise due care in the ministerial duties of recording entries on Lapidus's court file and in preparing a duplicate commitment order can potentially subject the State to liability, provided that the alleged negligence was a proximate cause of Lapidus's increased period of imprisonment.

Turning to the disputed issue of legal causation, Lapidus contends that the court erred in finding, as a matter of law, that her failure to controvert the predicate felony statement filed against her in 1998 constituted an intervening, superseding event which disrupted the causal link between the alleged negligence of the court employees and her service of an excessive period of imprisonment. More specifically, Lapidus argues that her failure to controvert her status as a second felony offender cannot be viewed as an intervening act because her actions at sentencing were set in operation by the negligence of the part clerk who created the nonexistent felony conviction and sentence. In this regard, she asserts that no harm could have befallen her if the false records had not been created. Lapidus further contends that her statements admitting her predicate felon status were understandable given her lack of education, the years of substance abuse which had ravaged her mind

and body, and her mistaken belief that she had been convicted of the 1987 assault in her absence. She also maintains that in determining whether her responses to the second felony offender inquiry were foreseeable, the court should have considered all of the unique facts surrounding the purported intervening event, including her motivation and physical condition. In response, the State does not specifically discuss the concept of superseding causation, upon which the court relied in granting that branch of its cross motion which was for summary judgment dismissing the complaint. Rather, the State maintains that the court correctly held that any errors committed by its employees were not a proximate cause of any excessive period of confinement. In support of its position, the State submits that it was not the natural and probable result of the prosecutor's and court's mistaken recital to Lapidus in 1998 that she had a prior felony conviction that she would then admit that she had, in fact, been convicted of the prior predicate felony rather than controvert the existence of the prior conviction. The State also focuses on the issue of foreseeability, maintaining that Lapidus's conduct in falsely concealing that she did not have a prior felony conviction was so improbable and unexpected as to be unforeseeable, and that "[h]aving chosen to 'game' the system on a gamble that the length of incarceration would be less if the court did not know the truth," Lapidus should not be heard now to complain.

More than two decades ago, the Court of Appeals observed in the leading case of *Derdiarian v Felix Contr. Corp.* (51 NY2d 308, 314 [1980]), that "[t]he concept of proximate cause, or more appropriately legal cause, has proven to be an elusive one, incapable of being precisely defined to cover all situations." This is so, in part, because the concept of proximate cause stems from "policy considerations that serve to place manageable limits upon the liability that flows from negligent conduct" (*id.*; *see Pagan v Goldberger*, 51 AD2d 508, 509 [1976]). Since the factors which are relevant to an assessment of legal cause vary depending on the facts of the particular case, it is ordinarily "for the finder of fact to determine legal cause, once the court has been satisfied that a prima facie case has been established" (*Derdiarian v Felix Contr. Corp.*, 51 NY2d at 315). To sustain this burden of proving a prima facie case, the plaintiff in a negligence action "must generally show that the defendant's negligence was a substantial cause of the events which produced the injury" (*id.*).

Under New York law, the issue of foreseeability is usually analyzed in considering whether one member of society owes a duty of care to another. In expressing the classic formulation of the role of foreseeability in negligence law, Chief Justice Cardozo wrote in *Palsgraf v Long Is. R.R. Co.* (248 NY 339, 344 [1928]), that "the risk reasonably to be perceived defines the duty to be obeyed." Thus, absent a foreseeable injury there is no duty, and absent a duty there is no negligence. "Foreseeability of risk is an essential element of a fault-based negligence cause of action because the community deems a person at fault only when the injury-producing occurrence is one that could have been anticipated" (*Di Ponzio v Riordan*, 89 NY2d 578, 583 [1997], citing Prosser and Keeton, Torts § 31, at 169-179, 170 n 15 [5th ed]).

However, foreseeability also plays a key role in the doctrine of superseding causation. An intervening act, by either the plaintiff or a third party, may, in some circumstances, sever the causal connection between the defendant's conduct and the plaintiff's injury, and constitute a superseding event which relieves the defendant of liability. "In such a case, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence . . . If the intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct, it may well be a superseding act which breaks the causal nexus" (*Derdiarian v Felix Contr. Corp.*, 51 NY2d at 315; *see Kush v City of Buffalo*, 59 NY2d 26, 33 [1983]; *Carson v Dudley*, 25 AD3d 983 [2006]; *Vetrone v Ha Di Corp.*, 22 AD3d at 839). The Court of Appeals has cautioned that in most instances, "whether an act is foreseeable and the course of events normal are questions which are generally subject to varying inferences presenting issues for the fact finder to resolve" (*Lynch v Bay Ridge Obstetrical & Gynecological Assoc.*, 72 NY2d 632, 636 [1988]; *see Soomaroo v Mainco El. & Elec. Corp.*, 41 AD3d 465 [2007]). While there are some cases where the question of legal cause may properly be decided as a matter of law, those cases "generally involve independent intervening acts which operate upon but do not flow from the original negligence" (*Derdiarian v Felix Contr. Corp.*, 51 NY2d at 315).

In order to constitute a superseding event severing the causal connection between the defendant's alleged negligence and the plaintiff's injury, the intervening act "must be a new and inde-

pendent force," which was not "set in motion by the defendant's own wrongful acts" (*Campbell v Cluster Hous. Dev. Fund Co.*, 247 AD2d 353, 354 [1998], quoting *Bell v New York City Health & Hosps. Corp.*, 90 AD2d 270, 285 [1982]). Furthermore, for the plaintiff's conduct to constitute a superseding cause, the plaintiff's "negligence must be more than mere contributory negligence, which would be relevant in apportioning culpable conduct. Rather, such conduct, in addition to being unforeseeable, must rise to such a level of culpability as to replace the defendant's negligence as the legal cause of the accident" (*Mesick v State of New York*, 118 AD2d 214, 218 [1986]).

Applying these principles to the highly unusual facts of this case, we find that the Court of Claims erred in granting that branch of the State's cross motion which was to dismiss the claim upon the ground that Lapidus's failure to controvert her status as a second felony offender at her 1998 sentencing for criminal sale of a controlled substance in the third degree was, as a matter of law, an intervening, superseding act which broke the causal chain between the alleged negligence of court employees and her imprisonment for an excessive period. This is not a case where the alleged intervening act, as a matter of law, was independent of and divorced from the original negligence. Rather, as Lapidus argues, she never would have been placed in the position of having to admit or deny that she was a predicate felon had not a court employee mistakenly recorded on her court file that she had been convicted of assault in the second degree and sentenced to a term of imprisonment for that crime. Thus, the conduct alleged to be an intervening act flows from the original alleged negligence of the part clerk, and not, as the State asserts, from "the prosecutor's and court's mistaken recital to claimant in 1997 that she had a prior felony conviction." Furthermore, in deciding the issue of superseding causation as a matter of law, the court failed to take into account the fact that it was the alleged negligent preparation of a duplicate commitment order by the sentence clerk subsequent to Lapidus's adjudication as a second felony offender which led DOCS to recalculate her sentence to include the 1½ to 4½ year term which supposedly had been imposed upon her for the nonexistent assault conviction. However, an argument can be made that the causal link between the alleged negligence of the sentence clerk who prepared the duplicate commitment order and Lapidus's service of an increased period of imprisonment could not have been severed by an act which occurred prior to

the alleged negligence. Accordingly, the case at bar is not one in which superseding causation can be determined to exist as a matter of law because it cannot be said, as a matter of law, that the plaintiff's injuries were caused by independent conduct which operated upon but did not flow from the defendant's alleged negligence.

Although the State further argues that the issue of proximate cause was properly decided in its favor because it was unforeseeable that a criminal defendant would falsely conceal the fact that she did not have a prior felony conviction, this argument merely serves to highlight that varying inferences can be drawn from Lapidus's conduct, which make it inappropriate to determine issues of proximate cause and superseding causation as a matter of law. While the State repeatedly asserts that Lapidus's conduct in failing to challenge her status as a second felony offender in 1998 was deliberate and calculated, her deposition testimony reveals that she believed that she might have been convicted and sentenced of assault in absentia. Lapidus's deposition testimony also portrays her as a woman of limited education, with a serious and long-standing addiction to narcotics, who was confronted at her 1998 sentencing with official documentation which seemingly showed that she had been convicted of assault in the second degree over nine years earlier. Lapidus's motivation for failing to challenge the predicate felony offender statement filed against her is relevant to the issue of superseding causation because analysis of this issue does not turn solely upon the predictability of the occurrence of a particular event. As legal commentators have pointed out, the inquiry is also a policy driven one, aimed at determining "whether the defendant's act, without which there would have been no harm to plaintiff, still bears a substantial nexus to the plaintiff's harm so as to constitute a proximate cause, or whether the intervening events have so attenuated the connection of defendant's act to the plaintiff's harm that fairness or policy dictate extinguishing defendant's liability" (Kreindler, Rodriguez, Beekman and Cook, New York Law of Torts § 8.1, at 397-398 [14 West's NY Prac Series 1997]). Thus, a plaintiff's culpability is a factor to be considered in determining whether his or her conduct should replace the defendant's negligence as the legal cause of the injuries sustained (*see Mesick v State of New York*, 118 AD2d at 218).

For these reasons, we find that factual questions are presented as to whether Lapidus's failure to controvert her status

as a second felony offender at her sentencing in 1998 was either so improbable and unforeseeable as to constitute a superseding event breaking the causal connection between the alleged negligence of the court employees and her service of an excessive period of confinement, and/or rises to such a level of culpability as to replace the defendant's alleged negligence as the legal cause of the accident. This is not to say, however, that if the trial court ultimately credits Lapidus's testimony and determines that her service of an excessive period of imprisonment was a foreseeable consequence of the negligent creation of records falsely indicating that she had been convicted of assault in 1989, and not so culpable as to rise to the level of a superseding cause, it must necessarily conclude that the alleged negligence of the court employees was the sole proximate cause of her injuries. Instead, in that event, Lapidus's conduct should be evaluated in terms of comparative negligence, and if the court determines, after hearing the evidence presented at trial, that her failure to investigate the status of her 1987 assault arrest, or question the validity of the predicate felony offender statement indicating that she had been convicted of this assault in January 1989, were substantial factors contributing to her injury, it should apportion negligence between both her and the State (*see Soto v New York City Tr. Auth.*, 6 NY3d 487, 492 [2006]).

We conclude by observing that the facts presented herein constituted a "perfect storm" of events which unfortunately culminated in Lapidus's service of a period of incarceration which was undeniably far over and above the sentence that she would have received, had the inclination of the trial court and the prosecutor toward imposing the minimum legal sentence been exercised within the boundaries of the law applicable to a first felony offender, and not the harsher limits required under the second felony offender statute. Indeed, the fact that Lapidus was ultimately sentenced to a term of 10 days under the 1987 assault in the second degree charge, and resentenced to a term of 1 to 3 years, nunc pro tunc, on the 1998 criminal sale of a controlled substance in the third degree conviction, clearly supports this conclusion. Whether and to what extent she should be permitted to recover damages for the excessive period of incarceration she was required to serve is an issue that ultimately must be resolved by the Court of Claims, in its role as trier of fact, after both parties have had an opportunity to make full evidentiary presentations at trial.

In light of our determination, we need not reach Lapidus's additional contention that the court erred in awarding the State summary judgment because DOCS employees voluntarily assumed a duty to investigate the accuracy of the duplicate commitment order, and breached this assumed duty by failing to conduct their investigation with due care. Accordingly, the order is modified, on the law, by deleting the provision thereof granting that branch of the defendant's cross motion which was for summary judgment dismissing the claim, and substituting therefor a provision denying that branch of the cross motion; as so modified, the order is affirmed.

SPOLZINO, J.P., COVELLO and DICKERSON, JJ., concur.

Ordered that the order is modified, on the law, by deleting the provision thereof granting that branch of the defendant's cross motion which was for summary judgment dismissing the claim, and substituting therefor a provision denying that branch of the cross motion; as so modified, the order is affirmed, without costs or disbursements.