*602 OPINION OF THE COURT
Michael D. Stallman, J.
Plaintiffs Monsur Miah, Amy Miah, and Tahara Miah are the infant children of plaintiff Razia Khatun-Miah and nonparty Nazir Miah. Plaintiffs allege, in sum, that the children have suffered significant permanent injuries as a result of their exposure to peeling and chipped lead-based paint in their home, which, from December 1988 through August 1996, was located at 20 Catherine Slip, apartment 14E. This building, and the Alfred E. Smith housing projects, of which it is a part, is, and at all relevant times was, owned and operated by defendant New York City Housing Authority (NYCHA).
In motion sequence No. 002, plaintiffs move, pursuant to CPLR 3212 (a), for an order granting them partial summary judgment on the issue of liability as to NYCHA. NYCHA cross-moves for summary judgment dismissing the complaint. In motion sequence No. 003, which is consolidated for disposition with motion sequence No. 002, defendant, the City of New York, moves, pursuant to CPLR 3211 (a) (7) and 3212 (a), for leave to move for summary judgment beyond the deadline set forth in a so-ordered stipulation, and for an order granting summary judgment dismissing the complaint.[1]
Facts
In a written application for housing, dated February 27, 1987, which Ms. Miah submitted to NYCHA, Ms. Miah listed Monsur and Amy, with their respective birth dates of May 2, 1985 and December 26, 1986, among the children who would be living with her. Subsequently, Ms. Miah amended her application to add Tahara, who was born on October 21, 1988. Accordingly, NYCHA had actual notice that three children below the age of six would be living in the apartment. NYCHA had the apartment painted shortly before the Miahs moved into it. No further paint work was performed until February 1994, when Mr. Miah repainted a portion of the apartment.
Blood lead levels are measured as micrograms of lead per deciliter of whole blood (pg/dl). On October 23, 1990, Amy and Tahara were each found to have blood lead levels of 10 pg/dl. On October 3, 1992, Tahara was diagnosed with a very high blood lead level of 45.7 pg/dl. On October 19, 1992, Tahara was admitted to Bellevue Hospital for asymptomatic lead toxicity. *603 She underwent chelation therapy, and remained in the hospital until October 27, 1992, after which time she continued oral chelation. She was readmitted for further chelation therapy on November 23, 1992, and, again, on September 21, 1993. On October 26, 1992, Tahara’s FEP (free erythrocyte protoporphyrin) level was 424 pg/dl.[2] Tahara’s lead levels remained elevated from the high 20s to the lower 40s through September 23, 1993, when they began to recede into the lower 20s and teens until May 15, 1997, at which time her lead level was 12 pg/dl. Tahara’s lead level did not decline below 10 pg/dl until March 23, 1998, when she was reported at 9 pg/dl, at age 9V2.
Amy’s lead level fell from the 10 pg/dl, reported on October 23, 1990, to 5 pg/dl, on March 2, 1992, but it then rose precipitously to 29 pg/dl, on October 27, 1992. On November 16, 1992, Amy’s FEP level was 156 pg/dl. Upon retesting on November 29, 1992, Amy’s lead level was 29 pg/dl, and her FEP level was 144 pg/dl. She was not tested again until May 13, 1996, when her lead level was 8.4 pg/dl.
Monsur’s lead level was measured as 16.4 pg/dl, on August 24, 1993, and at 20.5 pg/dl, on September 23, 1993. Monsur’s lead level remained in the mid-teens until at least February 24, 1994, when it was measured as 15.5 ph/dl.
In October 1992, after Tahara had been diagnosed with a high blood lead level, the New York City Department of Health (DOH) inspected the apartment, found peeling and loose paint throughout the premises, and, on October 28, 1992, issued an order to abate nuisance to NYCHA. NYCHA did not make the necessary repairs until late 1996, although, by January 13, 1993, NYCHA had received laboratory reports showing that paint samples from the apartment had tested positive for lead.
Plaintiffs’ Motion
During all relevant times, Local Law No. 1 (1982) of the City of New York (Administrative Code of City of NY former § 27-2013 [h]) created a presumption that, in any building erected prior to 1960, in which a child under the age of six resides, paint contains more than the allowed percentage of lead, and peeling paint constitutes a hazard of lead poisoning that the landlord is required to abate. (Juarez v Wavecrest *604 Mgt. Team, 88 NY2d 628, 647 [1996].)[3] Local Law 1 required the owners of multiple dwellings to “remove or cover” paint that contains more than 0.7 micrograms of lead, per square centimeter of surface, from any apartment in which a child six years old, or younger, resides. (Id.)
The elements of a prima facie claim of injury resulting from lead poisoning in a multiple dwelling constructed prior to 1960 are: actual or constructive knowledge that a child under the age of six resided in the building; actual or constructive notice of peeling paint in the apartment in which the child resided; failure of the landlord to use diligent and reasonable efforts to abate the lead hazard; and evidence that the child has been injured as a result of the lead hazard. (See, Juarez v Wavecrest Mgt. Team, 88 NY2d 628, supra.)
It is undisputed that the building in which the apartment is located was constructed prior to 1960 (NYCHA acquired it from the City in 1949); that NYCHA had actual notice that children under the age of six resided in the apartment; and that NYCHA failed to use diligent and reasonable efforts to abate the lead hazard that was present in the apartment. However, the parties’ medical experts disagree as to whether the children have been adversely affected by their exposure to lead.
Plaintiff’s expert, Marcia Knight, Ph.D., a clinical psychologist and neuropsychologist, who performed neurological examinations of each of the children, affirms that the results of these blood tests show that: Tahara sustained very significant lead poisoning for a period of at least 4V2 years, from age 3.11 through 9.5 years old; Amy clearly had lead poisoning as of November 16, 1992, that likely continued for more than three years; and Monsur sustained lead poisoning for at least six months, from age 8.3 to age 8.9. Dr. Knight also opines that Tahara’s and Amy’s FEP levels show that they had sustained a prolonged period of exposure to lead prior to their diagnosis.
Dr. Knight concludes that Tahara suffers from memory impairment, disturbance in sequencing, impulsivity, and impairment in perceptual-motor abilities, and that these *605 deficits prevent Tahara from functioning at the higher levels than she otherwise could attain. Dr. Knight concludes that Amy shows deficits in abstracting and sequencing, in perceptual-motor abilities, and in word finding; that these deficits have caused Amy not to function up to her optimal level of functioning; and that Amy’s difficulties with expressive language most likely are a factor in Amy’s apparent social withdrawal. Dr. Knight concludes that Monsur suffers from short-term memory impairment, disturbance in sequencing and abstracting, disturbance in attention and speed of information processing, and impairment in perceptual-motor abilities; and that these deficits prevent him from attaining a potentially higher level of functioning, estimated to be in the high average to superior range. Dr. Knight concludes that, within a reasonable degree of neuropsychological certainty, the deficits of each of the children are primarily attributable to lead poisoning.
However, NYCHA’s medical expert, Dr. Joseph Maytal, a board certified pediatric neurologist, avers that he conducted neurological examinations of each of the children, as well as reviewing the children’s medical and academic records. Dr. Maytal’s findings are contained in the reports of the neurological examinations that he performed, which are attached as exhibit B to his April 15, 2002 affidavit. Dr. Maytal concludes that the children’s past lead exposure has not adversely affected either their physical, or their cognitive development. This conclusion, and the evidence upon which it is based, suffice to raise a triable issue as to whether the children have suffered injury as a result of their exposure to lead. Because there can be no liability in tort absent injury, plaintiffs’ motion for partial summary judgment as to liability must be denied.
NYCHA’s Cross Motion
NYCHA argues that it had no notice that paint in the apartment was peeling until after the children were diagnosed with elevated blood lead levels, in October 1992, and that, accordingly, the complaint must be dismissed insofar as it asserts a claim for damages for lead exposure prior to October 1992.
In Juarez v Wavecrest Mgt. Team (supra), the Court held that, in order to prevail in a lead poisoning case, a plaintiff must show, inter alia, that the defendant had actual or constructive notice of peeling or flaking paint in the premises. The Court also held in that case that such constructive notice was provided by the right, implicitly granted to landlords by *606 Local Law 1 (and explicitly granted by Administrative Code former § 27-2008), to enter apartments in order to inspect for and repair lead paint defects. (See also, Woolfalk v New York City Hous. Auth., 263 AD2d 355 [1st Dept 1999].) Here, Ms. Miah’s lease for the apartment provided that the landlord will be permitted, upon reasonable advance notification to the tenant, to enter the apartment for the purpose of making repairs, and that the landlord may enter at anytime, without notice, where there is a reasonable cause to believe that an emergency exists.
NYCHA argues, however, that even had it exercised its right of entry, it would not have discovered any peeling paint in the apartment prior to Tahara’s diagnosis in October 1992, because there was no such peeling paint prior to that time. In her deposition, Ms. Miah testified that she noticed that paint in the apartment was peeling, only after a doctor at Bellevue Hospital, who was treating Tahara, asked about the condition of the apartment. (See, Yoars affirmation, exhibit G, at 42.) A person’s statement, that he or she had not noticed a particular condition, may give rise to the inference that such condition was absent. However, somewhat later in her deposition, Ms. Miah explained that she understood that peeling paint was dangerous only after the doctor questioned her; and that water leaks, which began “about a couple of years” after she had moved into the apartment in 1988, had exacerbated an already preexisting condition of peeling paint throughout the apartment. (See, id. at 45-46.) This presents a classic credibility question not capable of resolution by motion.
NYCHA also argues that the complaint as a whole must be dismissed, because the children’s elevated blood lead levels are attributable to their seven-week visit to Bangladesh in the summer of 1992, rather than to peeling paint in the apartment. In support of this argument, NYCHA has submitted two affidavits from Dr. Maytal, and an affidavit from Vincent Coluccio, who holds a doctorate in public health, and is a fellow of the New York Academy of Medicine.
Dr. Coluccio avers, on the basis of a review of the literature concerning lead hazards in Bangladesh, that blood lead levels are far higher there than in the United States, in part because leaded gasoline was used throughout Bangladesh through late 1999. Dr. Coluccio concludes that children visiting Bangladesh in the summer of 1992 “were at significant risk of excessive exposures to lead.” (Coluccio affidavit at 7.) Although potentially relevant, this general conclusion does not prove as a mat *607 ter of law that the children’s highly elevated blood lead levels in October 1992 were exclusively caused by the children’s seven-week long exposure to lead in Bangladesh.
On the basis of his review of the children’s medical records, Dr. Maytal opines, within a reasonable degree of medical certainty, that the children’s elevated blood levels[4] were caused by the children’s exposure to lead “during their trip to Bangladesh from July 1992 to September 4, 1992 or elsewhere rather than and to the exclusion of exposure to lead based paint at [the apartment].” (Maytal affidavit, dated Apr. 15, 2002, at 6 [emphasis added].) Dr. Maytal reasons that:
“[h]ad the infant plaintiffs’ respective lead levels been caused by the ingestion of lead based paint at the [apartment], it would have been expected that both Monsur and Amy would have had elevated blood lead levels prior to October 1992 when they were crawling and in the prime of the PICA stage. However, they did not. Moreover, while Tamara [sic] had a modest elevated blood level in October 1990, it was nowhere near her blood level in October 1992.” (Id. at 6.)
Here, the competing proof presents a classic “battle of the experts,” that may well raise more questions than it answers. Cross-movant has not met its burden of proving entitlement to judgment as a matter of law. Rather, the expert proof presents triable factual questions, including those related to causation and contribution not susceptible to resolution by motion.
The City’s Motion
Preliminarily, the court grants the City’s application for leave to move for summary judgment. Plaintiffs earlier had agreed to give the City an extension of time, and they are not now prejudiced by the City’s delay. NYCHA, which has no claim against the City, does not object to the City’s motion.
As amplified by plaintiffs’ bill of particulars, the complaint alleges that the City violated, inter alia, an administrative rule *608 of the New York City Health Code (24 RCNY 173.13). Section 173.13 (d) (2) provides, in relevant part, that:
“When the Department [of Health] finds that there is a child under 18 years of age with a blood-lead level of 20 micrograms per deciliter or higher residing in any dwelling and further finds that the interior of such dwelling has lead based paint * * * that is (a) peeling, (b) on a window friction surface or (c) on any surface that, in the Department’s determination, is a lead hazard because of its condition, location, or accessibility to children, it shall order the abatement of any such condition in a manner and under such safety conditions as it may specify * * * In the event that the owner or other person having the duty or liability to comply with such order fails to comply therewith within five (5) days after service thereof * * * the Department shall request the Department of Housing Preservation and Development to execute such order * *
As discussed above, on October 28, 1992, the Department of Health (DOH) served a notice to abate upon NYCHA, pursuant to this section. However, DOH did not reinspect the apartment five days after service of such notice, and, although it subsequently inspected the apartment on several occasions, there is no showing that it requested the Department of Housing Preservation and Development (HPD) to execute the order and abate the lead hazards in the apartment. Instead, DOH counseled Ms. Miah on appropriate nutrition for the children, and on methods of cleaning.
The City contends, however, that it is immune from liability for damages because DOH inspections are discretionary governmental operations, and because no special relationship was established between plaintiffs and DOH, and that, in any event, 24 RCNY 173.13 does not grant plaintiffs a private right of action.
A municipal department’s or a public employee’s discretionary act is immune from tort analysis and may not result in municipal liability; ministerial acts may be sued upon in tort only if a statute so provides or, in the absence of a statutory grant, if there is a special relationship between the plaintiff *609 and the municipality giving rise to a special duty.[5] (Lauer v City of New York, 95 NY2d 95 [2000].) Moreover, administrative rules or regulations do not provide an independent basis for municipal tort liability or set a tort standard different from, or lower than, common-law negligence.
DOH is accorded considerable discretion both in inspecting dwellings and remediating conditions. To the extent that the regulation mandates DOH to seek the intervention of HPD, it seems to speak in nondiscretionary language. However, section 173.13 is an internal, administrative regulation intended to coordinate the regulatory functions of two mayoral agencies. It neither sets forth a tort standard of care nor imposes a duty in tort running to any member of the public.
Without proof of a special duty, exercise of a regulatory function, whether involving inspection or reporting, does not trigger a private right of action unless specifically intended by the Legislature as evidenced by statutory language. To hold otherwise would not only contravene the analysis of the Court of Appeals in Lauer, it would make every regulatory act or omission the predicate for municipal liability on a simple negligence theory. It would make any regulatory agency potentially liable for any claimed consequence of governmental action or inaction in a way incapable of adequate investigation or defense.
The cited regulation was administratively adopted; it is not a statute. An administrative agency is not authorized to recognize a new cause of action of municipal liability via regulation the way the legislative branch may do so by statutory adoption. Thus, the cited regulation cannot serve as the basis for a private right of action for damages, and a private right of action may not fairly be implied from that article. Moreover, even if it were a statute, it would not suffice as a basis of a private claim. One factor that must be considered, in determining whether such a right may be implied from a statute, is “whether the plaintiff is one of the class for whose particular benefit the statute was enacted.” (Sheehy v Big Flats Community Day, 73 NY2d 629, 633 [1989].) Section 173.13, as a *610 whole, was created for the benefit of all residents of New York City and not for the special benefit of any specific class of people. (See Ubiera v Housing Now Co., 184 Misc 2d 846, 851 [Sup Ct, Bronx County 2000]; see 24 RCNY 173.13 [d] [1].)
Furthermore, article 173 imposes a number of other regulatory duties upon the City, none of which is intended to benefit a particular class. 24 RCNY 173.05 (d), for example, grants the Commissioner of Health of the City of New York (Commissioner) authority to require a hazardous substance (as defined by section 173.01 [a]) either to be labeled in the manner prescribed by section 173.05 (c), or to exempt such substance from that labeling requirement. 24 RCNY 173.14 (g) grants the Commissioner the authority to modify, in particular instances, the strict application of the safety standards for lead abatement, that are set forth in section 173.14 (e). It would be anomalous to imply a private right of action, under one section of article 173, where, clearly, there is no basis for such an implication under the article as a whole, or under any other section or subdivision thereof.
Accordingly, it is hereby ordered that plaintiffs’ motion for partial summary judgment is denied; and it is further ordered that the cross motion of the New York City Housing Authority for summary judgment is denied; and it is further ordered that the motion of the City of New York for summary judgment is granted and the complaint is hereby severed and dismissed as against defendant City of New York.

. The City’s motion also seeks the dismissal of all cross claims and counterclaims against the City. However, no such claims have been asserted.

. FEP levels provide an estimate of the extent of exposure to lead. If the FEP is normal (0-35 pg/dl) in the context of high blood lead level, the exposure is most likely acute. If blood lead level and FEP are elevated, then the exposure is most likely chronic. (See, Maytal affidavit at 4.)

. Effective November 12, 1999, the lead paint provisions of Local Law No. 1 were repealed and replaced with provisions contained at Administrative Code §§ 27-2056.1 through 27-2056.10. Administrative Code § 27-2056.4 (a) provides the owners of multiple dwellings a method of rebutting the presumption that the presence of peeling paint poses a lead hazard; Administrative Code § 27-2056.4 (b) provides a method for such owners to exempt their buildings from the presumption.

. Section 1370 (6) of the Public Health Law defines “[e]levated lead levels” as “a blood lead level greater than or equal to ten micrograms of lead per deciliter of whole blood or such blood lead level as may be established by the department pursuant to rule or regulation.” Similarly, both New York State Department of Health Regulations (10 NYCRR) § 67-1.1 (d) and New York City Health Code (24 RCNY) § 11.03 define elevated blood lead levels, i.e., levels sufficient to trigger regulatory action, as a blood lead level of 10 micrograms or more per deciliter of whole blood.

. In addition, the City is not liable for the negligent performance of its governmental duties absent a special duty arising from a special relationship. (Marquez v Quarishi, 2001 WL 984726, 2001 US Dist LEXIS 12889 [SD NY 2001]; Gibbs v Paine, 280 AD2d 517 [2d Dept 2001].) Plaintiffs neither alleged a special relationship in their complaint, nor sought leave to amend their complaint. Moreover, it is clear from the papers before this court that the requisites for a special duty are lacking.