OPINION OF THE COURT
Judith A. Hard, J.
Procedural Background
In February 2009, this court granted claimant’s motion for summary judgment on the issue of liability, holding that a 2003 Supreme Court decision collaterally estopped the State from re-litigating the issue of whether there had been ministerial neglect (Signature Health Ctr, LLC v State of New York, 23 Misc 3d 1103[A], 2009 NY Slip Op 50559[U] [Ct Cl 2009]). Implicit in this court’s ruling on the summary judgment motion was its understanding that, pursuant to the State’s waiver of sovereign immunity, governmental entities could be liable under the traditional principles of tort law for injury caused by the ministerial negligence of their employees. Later that year, McLean v City of New York (12 NY3d 194 [2009]) and Dinardo v City of New York (13 NY3d 872 [2009]) raised doubts about that understanding, as the Court of Appeals held that a governmental entity cannot be held liable for ministerial negligence unless there was a “special relationship” between the parties, one giving rise to a “special duty” owed to the injured party by the government. Neither the 2003 Supreme Court proceeding nor *545 this court’s earlier summary judgment decision contained any inquiry into whether such a special relationship/special duty existed between defendant and claimant in this matter. The damages trial was subsequently held, but mindful that “a change in decisional law usually will be applied retrospectively to all cases still in the normal litigating process” (Gager v White, 53 NY2d 475, 483 [1981]), the court directed the parties to submit supplemental briefs regarding the impact, if any, that McLean and Dinardo would have on this claim. In applying McLean to the instant action, the court determines that claimant was owed a special duty by the State, based on a statutory private right of action, but that it has failed to sufficiently prove that it is entitled to damages.
Facts
In 1999 Signature Health Center, LLC (claimant) was approved as a new medical diagnostic and treatment center by the New York State Department of Health (DOH). Its budgeted rate for Medicaid billing purposes was $132.84 per threshold patient visit. Pursuant to Public Health Law § 2807, this budgeted rate was subject to a retroactive adjustment based upon actual costs incurred for the first full year of operation (see 10 NYCRR 86-4.19 [b]). In October 2001, claimant sought its initial adjustment, based upon a “cost report”[1] for 2000. The cost report was reviewed, endorsed and approved by DOH, and a new threshold rate was calculated. This new rate, which was an increase of approximately $35 per threshold visit over the original budgeted rate, was then certified by the New York State Division of the Budget (DOB). In May 2002, claimant made á revision of its cost report for 2000 and sought a further rate adjustment. The second revision request was approved by DOH, in an amount approximately $12 per threshold visit higher than the rate certified in claimant’s initial rate adjustment, and certified by DOB in 2002. Despite the foregoing, DOH failed to publish the revised rates and, as a result, failed to pay claimant in conformance with the revised rates.
Claimant initiated a CPLR article 78 proceeding seeking orders of mandamus directing defendant to “publish”[2] the new reimbursement rates and to release payments due to claimant. *546 In June 2003, Supreme Court, Albany County found that posting of new rates, after they were approved by DOH and certified by DOB, was a ministerial act, one in which the duty to be performed was required by law and involved no exercise of discretion.[3] As such, it was subject to an order of mandamus.
“[0]nce the revised rates have proceeded through the administrative review and approval process to the point where the [Division of Budget] has approved the revised rates and returned them to respondent for posting, there is no statutory, regulatory or other authority for providing for another ‘final approval’ by respondent.” (Signature Health Ctr., LLC v New York State Dept. of Health, Sup Ct, Albany County, June 19, 2003, Sheridan, J., index No. 2263-03, decision, order and judgment.)
Because there was no authority for defendant to refrain from posting the rates once they were approved by DOB, Supreme Court directed that they had to be posted and that DOH had to make “all payments due to petitioner in accordance with the revised reimbursement rates” {id. at 11). This resulted in, among other things, payment of $3 million in retroactive reimbursement {id. at 3). Following the mandamus decision, claimant moved in Supreme Court to recover additional amounts representing attorney fees, costs, and the loss of prejudgment and postjudgment interest. That motion was denied on the ground that claimant was not entitled to attorney fees pursuant to article 86 of the CPLR and there was no statutory authority for awarding interest on retroactive Medicaid reimbursements' (Signature Health Ctr., LLC v New York State Dept. of Health, Sup Ct, Albany County, Sept. 16, 2003, Sheridan, J., letter decision and order).
Thereafter, claimant commenced the instant action to recover for consequential damages resulting from DOH’s delay in posting the rates. The damages demand includes, among other things,
“the substantial loss of value of Signature’s busi *547 ness caused by the illegal acts or failure to act on the part of the DOH, the legal fees and expenses of Signature’s Chapter 11 proceeding, the loss of business which resulted from a lack of funds, additional expenses incurred by Signature because of its poor credit standing and inability to pay its obligations as they became due, the interest expenses borne by Signature for borrowing necessitated by DOH’s wrongful withholding of approval, and interest on the money wrongfully withheld by DOH” (claim 1114).
Pre-2009 Law
In 1929, the State waived its immunity from civil liability and consented to have actions against it “determined in accordance with the same rules of law as applied to an action in the supreme court against an individual or a corporation” (L 1929, ch 467, § 1, adding Court of Claims Act § 12-a, subsequently recodified as Court of Claims Act § 8). This waiver also removed immunity from counties, cities, towns and villages (see Bernardine v City of New York, 294 NY 361 [1945]). Since then, courts have developed various tests to define the nature and extent of this waiver. The general rule of liability for governmental actions[4] was articulated in Tango v Tulevech (61 NY2d 34, 40 [1983]):
“[W]hen official action involves the exercise of discretion, the officer is not liable for the injurious consequences of that action even if resulting from negligence or malice. Conversely, when the action is exclusively ministerial, the officer will be liable if it is otherwise tortious and not justifiable pursuant to statutory command.”
Discretionary or quasi-judicial acts were defined as those that “involve the exercise of reasoned judgment which could typically produce different acceptable results,” while ministerial acts were defined as those that “direct adherence to a governing rule or standard with a compulsory result” (id. at 41). Tango did not address either qualified immunity or special duty which, at the time that decision was issued, were recognized as excep *548 tions to the general rule of nonliability for discretionary governmental actions.
Discretionary Governmental Actions
Governmental actions that are judicial or quasi-judicial in nature are, and have been at all times, entitled to absolute immunity (Tarter v State of New York, 68 NY2d 511 [1986]). On the other hand, governmental actions that require the exercise of discretion but are not judicial or quasi-judicial have been held to be entitled to “qualified immunity,” meaning that they are immune from liability unless performed in bad faith or without reasonable basis (see Affleck v Buckley, 96 NY2d 553, 556 [2001] [recognizing qualified immunity for highway design decisions]; Ernest v Red Cr. Cent. School Dist., 93 NY2d 664, 673 [1999] [county not entitled to qualified immunity where it failed to conduct any study or take any remedial action despite knowledge of danger to children leaving its school]; Arteaga v State of New York, 72 NY2d 212, 216 [1988] [qualified immunity shields the government “except when there is bad faith or the action taken is without a reasonable basis”]; Della Pietra v State of New York, 71 NY2d 792, 798 [1988] [liability imposed despite qualified immunity where state investigators were grossly negligent, reckless, and acting without authority]; Weiss v Fote, 7 NY2d 579, 586 [1960] [no basis for liability “absent some indication that due care was not exercised in the preparation of the design or that no reasonable official could have adopted it”]; see also Haddock v City of New York, 75 NY2d 478, 485 [1990] [no immunity for discretionary personnel decision where there is no evidence the City “made any such decision or exercised any such discretion”]). The Court of Appeals did not address qualified immunity in McLean or Dinardo, and at least one court has held that this exception is unaffected by those recent decisions (Metz v State of New York, 27 Misc 3d 1209[A], 2010 NY Slip Op 50635[U] [Ct Cl 2010]).[5]
*549 Prior to McLean and Dinardo, it was the understanding of this court, and apparently many other courts, that there was another, very narrow exception to the general rule of nonliability for discretionary governmental acts: situations in which the injured party had a “special relationship” with the government, one giving rise to a “special duty” owed by the government to the injured party, where the injury resulted from a violation of the special duty (see e.g. Pelaez v Seide, 2 NY3d 186, 195 [2004]; Cuffy v City of New York, 69 NY2d 255 [1987]; Florence v Goldberg, 44 NY2d 189 [1978]). In Pelaez, the Court of Appeals stated that such a special relationship/special duty can be created in one of three ways: (1) by a statute that was enacted for the benefit of a particular class of persons is violated; (2) by voluntary assumption of a duty toward a private party who then justifiably relies on proper performance of that duty; or (3) by assuming positive direction and control in the face of a known, blatant and dangerous safety violation (2 NY3d at 199-200, citing Garrett v Holiday Inns, 58 NY2d 253, 261-262 [1983]).[6]
The latter method of creating a special duty involves very specific, unique and rather self-evident factual situations (see Smullen v City of New York, 28 NY2d 66 [1971] [city construction inspector assured worker that the sides of a trench were safe; trench collapsed and killed the worker]) and it is occasionally treated as simply an example of the second category, voluntary assumption of a duty (see e.g. Browne v Town of Hempstead, 110 AD2d 102 [2d Dept 1985]; Hill v City of Schenectady, 91 AD2d 1126 [3d Dept 1983]). To establish a special duty based on the government’s voluntary assumption of a duty, the injured party must prove: (1) the assumption by the municipality, through promises or actions, of affirmative duty to act on behalf of the party who was injured; (2) knowledge on part of a municipality’s agents that inaction could lead to harm; (3) some form of direct contact between the municipality’s agents and the injured party; and (4) the injured party’s justifiable reliance *550 on the municipality’s affirmative undertaking (Cuffy v City of New York, 69 NY2d 255 [1987], cited in McLean v City of New York, 12 NY3d at 201; Pelaez v Seide, 2 NY3d at 198-199).
As to the first category, statutory duties or, as described in Pelaez, a special duty created by statute, the Court of Appeals has held that “the governing statute must authorize a private right of action” (Pelaez v Seide, 2 NY3d at 200, citing Uhr v East Greenbush Cent. School Dist., 94 NY2d 32 [1999], supra; Sheehy v Big Flats Community Day, 73 NY2d 629 [1989]; O’Connor v City of New York, 58 NY2d 184 [1983]). While it is preferable for the Legislature to include an express provision within the legislation if it intends to allow private litigants to sue for violation of a statute’s provisions (Burns Jackson Miller Summit & Spitzer v Lindner, 59 NY2d 314, 325 [1983]), courts may nevertheless recognize an implied right of action where: (1) the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) recognition of a private right of action would promote the legislative purpose of the governing statute; and (3) creation of such a right would also be consistent with the legislative scheme (Pelaez v Seide, 2 NY3d at 200). All three prongs of this test must be satisfied before such a right of action can be recognized, but it is the third factor — whether recognizing a private right of action is consistent with the overall legislative scheme — that has been described as the “most critical” and is the one most difficult to establish (Mark G. v Sabol, 93 NY2d 710, 720 [1999]; Carrier v Salvation Army, 88 NY2d 298, 302 [1996]; Brian Hoxie’s Painting Co. v Cato-Meridian Cent. School Dist., 76 NY2d 207, 212 [1990]). Thus, even when a statute has been enacted for the particular benefit of a class of persons and allowing private lawsuits would further the legislative purpose, a private right of action will not be recognized if doing so would conflict with, or be inconsistent with, the enforcement mechanisms that were expressly included in the legislation (see e.g. McLean v City of New York, 12 NY3d at 200; Pelaez v Seide, 2 NY3d at 201; Uhr v East Greenbush Cent. School Dist., 94 NY2d at 38; Sheehy v Big Flats Community Day, 73 NY2d 629, 634-635 [1989]; Burns Jackson Miller Summit & Spitzer v Lindner, 59 NY2d at 329-330).
No matter what method is used to establish a special relationship/special duty, the task is a difficult one. The Court of Appeals has recognized this, observing that “a plaintiff has a heavy burden in establishing such a relationship . . . [and] we have dismissed most such claims as a matter of law” (Pelaez v *551 Seide, 2 NY3d at 199 n 8). It was considered to be appropriate that any exception permitting liability to be imposed for the exercise of discretion be narrowly construed and difficult to prove, because the immunity generally accorded such actions
“reflects a value judgment that — despite injury to a member of the public — the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury” (Haddock v City of New York, 75 NY2d at 484).
Ministerial Governmental Actions
Prior to McLean and Dinardo, and in contrast to the extensive protection given discretionary governmental actions, it was generally considered that ministerial governmental duties were no longer protected by any vestige of sovereign immunity, and, consequently, that liability could be imposed under the same common-law principles applicable to private citizens or corporations. That is to say, recovery could be had if the injured party succeeded in establishing the following: “(1) the existence of a duty on defendant’s part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof’ (Akins v Glens Falls City School Dist., 53 NY2d 325, 333 [1981], citing Prosser, Torts § 30, at 143 [4th ed]). Proof that a government official was negligent in his or her performance of a ministerial duty was not sufficient to warrant the imposition of liability, because “the concept of a duty of care, which is essential to the law of negligence, has meaning only when it is considered in relation to both the harm that the duty exists to prevent and the class of individuals to whom it is owed” (Waters v New York City Hous. Auth., 69 NY2d 225, 229 [1987]).
The existence and scope of an alleged tortfeasor’s common-law duty is an issue to be determined by the courts (Eiseman v State of New York, 70 NY2d 175, 187 [1987]), and the relevant inquiry is “whether the plaintiffs interests are entitled to legal protection against the defendant’s conduct” (Pulka v Edelman, 40 NY2d 781, 782 [1976], rearg denied 41 NY2d 901 [1977], quoting Prosser, Torts § 53, at 325 [4th ed]). In contrast to the very precise requirements that must be met in order to establish that a “special duty” exists, a common-law duty to exercise reasonable care in performing certain tasks is owed to persons who have a “distinctive and direct interest” in proper perform *552 anee and who will receive “a special and peculiar injury” if it is negligently performed (Schwartz v Heffernan, 201 Misc 101, 103 [Süp Ct, NY County 1951], affd 279 App Div 898 [1st Dept 1952], affd 304 NY 474 [1952] [election officials had duty to place names on ballot if presented with proper documentation; liable to candidate whose name was omitted]; Lapidus v State of New York, 57 AD3d 83, 93 [2d Dept 2008] [court employees owe duty of due care when recording criminal convictions; liable to person who was erroneously adjudged a predicate felon because of incorrect entry]). Determining the existence of a duty requires the court to consider the defendant’s allegedly wrongful act and the injured person’s “reasonable expectation of the care owed and the basis for the expectation” (Polka v Servicemaster Mgt. Servs. Corp., 83 NY2d 579, 585 [1994], citing Turcotte v Fell, 68 NY2d 432, 437 [1986]; Palsgraf v Long Is. R.R. Co., 248 NY 339, 344 [1928] [“The risk reasonably to be perceived defines the duty to be obeyed”]).
Statutes, even those that do not create a private right of action, play a role in establishing the reasonableness of an injured person’s expectations and the scope of any duty owed by a defendant. Most notably, a statute may define, or redefine, the standard of care that must be considered in determining whether certain actions were negligent (see e.g. Rivera v Nelson Realty, LLC, 7 NY3d 530, 535 [2006] [“While the common-law rule of nonliability of a landlord to a tenant was not abolished by Basso, we have recognized significant modifications of that duty by statute and contract”]). Courts may adopt a statutory standard of conduct as the “standard of conduct of a reasonable man” (i.e., the standard by which negligence is determined) when the purpose of the legislation, in whole or in part, is the following: “(a) to protect a class of persons which includes the one whose interest is invaded, and (b) to protect the particular interest which is invaded, and (c) to protect that interest against the kind of harm which has resulted, and (d) to protect that interest against the particular hazard from which the harm results” (Restatement [Second] of Torts § 286).
There is naturally some overlap between judicial application of a statutory standard of conduct in a common-law negligence claim and recognition of a private right of action based on statutory violation, but they are not synonymous and one does not exclude the other. Both require the statute in question to be for the benefit of a particular class of persons, not the public in general, but as is discussed above, much more is required to *553 conclude that the statute actually creates a private right of action. A private right of action is the more powerful remedy, of course, as it imposes “per se liability without any of the limitations applicable to the common-law forms of action” (Burns Jackson Miller Summit & Spitzer v Lindner, 59 NY2d 314, 330 [1983]). If the statute in question does not provide a private right of action and does not expressly abolish the relevant common-law cause of action, then the “traditional, though more limited, forms of action” are still available; violation of the statute “constitute^] a breach of duty, independent of the statute, which common-law remedies made compensable” (id. at 331; see also Restatement [Second] of Torts § 286, Reporter’s Notes). Even where a private right of action is created by the statute, that remedy “is cumulative” to any existing common-law remedy unless the Legislature provides that it is to be “exclusive” (59 NY2d at 324, quoting Candee v Hayward, 37 NY 653, 656 [1868]; McKinney’s Cons Laws of NY, Book 1, Statutes § 34). There are numerous decisions issued prior to McLean and Dinardo in which courts held that, upon proper proof, a party could recover for injury caused by negligence in performing ministerial governmental duties without the necessity of finding either a special duty or a statutory private right of action.[7]
*554 In summary, prior to 2009, when McLean and Dinardo were issued, most New York courts understood the law of governmental immunity to be as follows: (1) judicial and quasi-judicial actions were protected by absolute immunity; (2) discretionary actions that were not judicial or quasi-judicial could lead to liability only where the action was taken in bad faith or without reasonable basis, or where the government had assumed a special duty owed to the injured party; and (3) ministerial governmental actions subjected the government to the same principles of liability applicable to private individuals and corporations.[8]
McLean and Dinardo
In McLean, the Court of Appeals made it clear that this understanding of the law outlined above was incorrect. That case arose from a ministerial error on the part of the New York City Administration for Children’s Services, when it renewed the license of a child care provider against whom there were outstanding complaints. The City was sued by a mother whose child had suffered an injury consistent with “shaken baby *555 syndrome” while in the care of this provider and who, it was stipulated, would not have chosen to use the provider if it had not been listed as a licensed provider and if she had not been assured that that meant there were no outstanding complaints.
The trial court denied the City’s motion for summary judgment, holding that there was sufficient evidence for a common-law negligence claim and that if “for the sake of argument” it was necessary to find a “special relationship,” that requirement could also be met (14 Mise 3d 922, 935 [Sup Ct, NY County 2007]). The First Department affirmed, holding: (1) that if the act of renewing the provider’s certification was considered ministerial, there was a question of fact as to whether the City had disregarded the governing rules; and (2) that, in any event, the City owed a special duty to a protected class of individuals (children in registered day care facilities) that could result in liability for negligent acts or omissions “regardless of whether the alleged acts or omissions were ministerial or discretionary” (49 AD3d 393, 393 [1st Dept 2008]).
The Court of Appeals reversed both holdings and dismissed the complaint, describing the applicable law in the following manner: “Tango and Lauer [v City of New York, 95 NY2d 95 (2000)] hold that discretionary municipal acts may never be a basis for liability, while ministerial acts may support liability only where a special duty is found” (12 NY3d at 202). The Court concluded that the City did not owe the mother and/or the child a special duty because there was no statutory private right of action and there had been no direct assumption of a duty on the part of the City. It also flatly rejected plaintiffs argument that “because the acts for which she sues are ministerial, no special duty or special relationship need be established” {id.), stating that “[government action, if discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general” {id. at 203).
Subsequently, in Dinardo v City of New York (13 NY3d 872 [2009]), the Court reiterated this rule of law, at least with respect to the requirements for proving liability based on ministerial actions by a government agent. Although the alleged negligence (failure of school officials to protect a teacher against whom threats were made) was discretionary in nature, the Court based its ruling on the conclusion that even if the school officials’ actions had been ministerial, a special relationship between the municipality and plaintiff could not be proved because *556 the assurances given by school officials were not “definite enough to generate justifiable reliance by the plaintiff’ (id. at 874).
It appears the State’s waiver of sovereign immunity now applies only to the following: (1) proprietary activities, (2) discretionary, nonjudicial actions taken in bad faith or without reasonable basis, and (3) ministerial actions where there is a special duty owed by the government to the injured party (which may include statutory private rights of action relating to ministerial duties). Precisely when this change in the law occurred is not clear. McLean seems to suggest that the law has been well settled since the 1983 decision in Tango or, at the latest, by 2000 when Lauer was issued. The complaint in Tango, however, alleged that a special duty existed (see 61 NY2d at 39), and the Court neither addressed this issue nor explained why it was not addressed. For that reason, and because there were many post-Tango decisions from both the Court of Appeals and lower courts that recognized the special duty exception permitting liability for discretionary actions, it is difficult to discern that a change in the law occurred that early. In Lauer, the intermediate appellate court had held that the City owed a ministerial duty to the injured party and, in addition, that there was a special duty running from the City to the plaintiff (258 AD2d 92 [1999]). The appellate court stated that the special duty analysis was not strictly necessary, because “the failed municipal service complained of was ministerial rather than discretionary” (id. at 102). The Court of Appeals reversal, therefore, is logically read as rejecting both of the lower courts’ holdings, ruling first that there could be no liability for ministerial negligence, and second that there was no special relationship or special duty between the parties (95 NY2d at 102 [“Nor do we find any duty to plaintiff derived from a ‘special relationship’ with him”]). The discussion of section 557 of the New York City Charter in the first half of the decision could be giving consideration to the statute as setting the standard of care or shaping the scope of the common-law duty.
It is possible, however, to read Lauer in a different way, as holding that there is no liability for ministerial negligence because New York City Charter § 557 did not contain an implied private right of action[9] and the City had not voluntarily assumed a duty to carry out certain actions for the plaintiffs ben *557 efit. If this is the correct reading of Lauer, it must be acknowledged that few, if any, courts understood that to be the case. Research has disclosed no decision prior to 2002 in which a court held, or even stated in dicta, that discretionary governmental actions can never, under any circumstances, lead to liability and that ministerial governmental actions may result in liability only where there is violation of a special duty. In fact there appear to be only three decisions making such statements during the period from 2002 to 2009: Miah v New York City Hous. Auth. (193 Misc 2d 601, 608-609 [Sup Ct, NY County 2002]); Marin v City of New York, (190 Misc 2d 809, 811 [Sup Ct, NY County 2002]); and the Second Department’s decision in Pelaez v Seide (300 AD2d 461, 462 [2002]). While these three decisions, and McLean, rely on Lauer as authority for that proposition, there were over 40 decisions issued during the same time period in which Lauer was cited in support of the previously established view of governmental liability. In some cases this reliance was express, with the courts stating that there was a special duty exception to immunity for discretionary governmental activity and/or that ministerial actions could result in the imposition of liability in accordance with traditional tort principles, and in others, the reliance was implicit, as when special duty analysis was applied to discretionary governmental actions or cases involving ministerial acts were decided with no such inquiry (see e.g. United Servs. Auto. Assn. v Wiley, 60 AD3d 1042 [2d Dept 2009]; Lapidus v State of New York, 57 AD3d 83 [2008]; Battaglia v Town of Bethlehem, 46 AD3d 1151 [3d Dept 2007]; Lodge-Stewart v State of New York, 45 AD3d 939 [3d Dept 2007]; Abraham v City of New York, 39 AD3d 21 [2d Dept 2007]; Brown v City of New York, 22 AD3d 241 [1st Dept 2005]; Emmerling v Town of Richmond, 13 AD3d 1150 [4th Dept 2004]; Tappan Wire & Cable, Inc. v County of Rockland, 7 AD3d 781, 782-783 [2004]).
*558 Current Law Applied to the Instant Claim
Although it is not entirely clear when the principles articulated in McLean became the governing law, and lower courts are struggling with McLean’s statement that discretionary governmental actions “may never be a basis for liability” (12 NY3d at 202),[10] there appears to be no dispute regarding its statement of the current law relevant to ministerial governmental actions. The current law, that there can be no liability unless a special duty was owed by the defendant to the claimant, is different from the law applied by this court in deciding the issue of liability in the instant case, and consequently that earlier ruling cannot stand unless it is determined that in the circumstances presented here, the State, specifically DOH, owed a “special duty” to claimant to post the revised reimbursement rates once they were approved by DOB.
Here, there is no blatant and dangerous safety violation over which the State had assumed control, nor is it possible to find that a special relationship was created by any voluntary assumption of a duty on the part of the State. While it might be possible to argue that the State “voluntarily assumed” the duty to carry out its regulatory mandate and was aware that failure to do so could cause harm, there is simply no allegation or sufficient evidence of any direct contact between claimant and those in DOH who had authority to post the rates, or that claimant was given any specific assurances by DOH on which it then reasonably relied.
It is possible, however, to conclude that the relevant statute, Public Health Law § 2807, implicitly created a private right of action for the benefit of treatment providers who become entitled to reimbursement under its provisions. As a licensed Medicaid provider, claimant is a member of the class for whose *559 particular benefit this statute was enacted. Secondly, since Public Health Law § 2807 authorizes and provides a method to pay Medicaid providers, allowing them to bring an action to obtain compensation would be appropriate. Third, permitting a private right of action is consistent with the legislative scheme, as the Medicaid program was enacted to provide adequate health care to the indigent, and assuring payment to the providers for such care is an integral part of the legislative plan. Therefore, the court holds that defendant’s ministerial duty to post the revised rates and make payment once DOB certified the increased rates constitutes a special duty as defined in Pelaez and required by McLean.
Damages
The claim alleges that claimant sustained damages that include
“the substantial loss of value of Signature’s business caused by the illegal acts or failure to act of the DOH, the legal fees and expenses of Signature’s Chapter 11 proceeding, the loss of business which resulted from a lack of funds, additional expenses incurred by Signature because of its poor credit standing and inability to pay its obligations as they became due, the interest expenses borne by Signature for borrowing necessitated by DOH’s wrongful withholding of approval, and interest on the money wrongfully withheld by DOH. Those damages aggregate a sum in excess of $2,500,000.00.” (Claim 1i 14.)
Both parties offered experts for the assessment of the claimed damages. Claimant’s expert witness, Sam Rosenfarb, is a certified public accountant, certified fraud examiner, certified valuation analyst, certified business appraiser and an accredited business valuator by the American Institute of Certified Public Accountants. He is a frequent lecturer and has testified in many courts as an expert since 1995. Defendant’s expert, Steven Egna, is a certified business appraiser and a certified merger and acquisition advisor. Although his certifications are more recent than Mr. Rosenfarb’s certifications, Mr. Egna also has 25 years of experience in financial management, including 16 years with the General Electric Company.
The determination of a witness’ qualification to testify as an expert rests in the sound discretion of the trial court (Meiselman v Crown Hgts. Hosp., 285 NY 389 [1941]). “A witness may be qualified as an expert based upon ‘[l]ong observation, actual *560 experience and/or study’ ” (Steinbuch v Stern, 2 AD3d 709, 710 [2d Dept 2003], quoting McLamb v Metropolitan Suburban Bus Auth., 139 AD2d 572, 573 [2d Dept 1988]). Claimant made a motion to strike Mr. Egna’s testimony due to his credentials and lack of experience in lost profit analysis. This motion is denied. Although Mr. Rosenfarb is a more seasoned expert witness, Mr. Egna demonstrated sufficient business knowledge, based upon his experiences and studies, to testify and document the factors which would or would not contribute to a lost profit analysis and the management of a business.
Tort actions have well-settled rules relating to the recovery of damages:
“The person responsible for the injury must respond for all damages resulting directly from and as a natural consequence of the wrongful act . . . whether the damages could or could not have been foreseen by him. The damages cannot be remote, contingent or speculative. They need not be immediate, but . need to be so near to the cause only that they may be reasonably traced to the event and be independent of other causes” (Steitz v Gifford, 280 NY 15, 20 [1939]).
Tort actions differ from contract actions as there is no requirement that the damages were contemplated by the parties, “but the principle that damages must be reasonably certain and not based on speculation is the same” (Bryant v State of New York, Ct Cl, May 13, 2009, Mignano, J., UID No. 2009-029-001, claim No. 103376, citing Guard-Life Corp. v Parker Hardware Mfg. Corp., 50 NY2d 183, 197 n 6 [1980], citing Restatement [Second] of Torts § 774A, Comment c). That is to say, the quantum of damages must “be capable of measurement based upon known reliable factors without undue speculation” (Ashland Mgt. v Janien, 82 NY2d 395, 403 [1993]) and “directly traceable to the breach, not remote or the result of other intervening causes” (Kenford Co. v County of Erie, 67 NY2d 257, 261 [1986]).
“[A] cause of action for negligence . . . seeks to provide a remedy for an individual injured because of another’s violation of an obligation imposed not by contract, but by law. It does not attempt to afford the injured party the benefit of any bargain, but rather endeavors to place him in the position he occupied prior to his injury.” (Martin v Dierck Equip. Co., 43 NY2d 583, 589 [1978].)
*561 Claimant primarily relied upon its expert witness, Mr. Rosenfarb, to prove its damages. Mr. Rosenfarb concluded from his study[11] that Signature would have generated $2.37 million of profit, roughly equivalent to profits generated in 2004, if it had received its Medicaid reimbursements from defendant in a timely manner for work completed in 2000-2003 (transcript at 146). He looked at profits for three years (2002-2004) of the nine-year operation. Signature Health Center (SHC) made approximately the same amount of money in 2002 and 2004 (transcript at 146). He considered the number of procedures performed in 2003 and 2004. A higher number of procedures was completed in 2004 (165,000), but only 113,000 were performed in 2003 (transcript at 142, 143). Mr. Rosenfarb concluded that the same number of medical procedures would have been performed in 2003 if SHC had timely received its monies from the State. Mr. Rosenfarb did not look at 2005-2007 (transcript at 184-186)[12] and only noted that the number of procedures fluctuated during 2001-2003 (transcript at 189). Although he testified that he investigated all reasons that could have caused a change in SHC’s position and rejected such reasons, he did not sufficiently explain how he conducted this investigation or why he rejected these other possibilities.
The court believes that his calculations focused on only two years of SHC’s operation (2003 and 2004) in order to ensure a higher calculation for lost profits. Such a snapshot casts doubt upon the requirement that the damages be “reasonably certain” (Guard-Life Corp. v Parker Hardware Mfg. Corp., supra). The “testimony of an expert witness, if based on surmise and inadequate data, may not serve as the basis for an award of damages” (Haig, Commercial Litigation in New York State Courts § 59:63 [4 West’s NY Prac Series 2d ed]).
Further, claimant did not sufficiently establish that the lost profits resulted directly from and as a natural occurrence of the delayed reimbursement. In 2000-2002, there were significant cash withdrawals from SHC (approximately $2.1 million total) but only one capital contribution of $1.493 million in 2000 (court exhibits 1, 4). There were also uncollected amounts due from *562 SHC’s affiliates[13] between 2000-2002 in the amount of approximately $1.7 million (court exhibits 1, 4). SHC was having cash flow problems as early as 2000 when it stopped construction on another clinic (transcript at 36-38). Additionally in 2001, it was defaulting on certain leases for equipment (transcript at 109).
Claimant’s expert did not satisfactorily explain why the capital withdrawals in the years preceding the 2003 bankruptcy and the uncollected monies from the affiliates in such years did not contribute to SHC becoming insolvent. He concluded only that in 2003, the year of bankruptcy, operations were impeded by a lack of funds from the delayed reimbursements. It appears to the court that SHC grew too fast to support itself. It had already defaulted on an equipment lease and stopped construction on a new clinic well before it filed its paperwork with defendant for a rate increase in the fall of 2001. Further, if SHC had been timely paid by defendant, it still would have been $2.1 million in debt in December 2002 (transcript at 175-176). Claimant has not established by a preponderance of the evidence that the untimely payments by defendant were the independent reasons for the claimed $2.5 million in lost profits (Steitz v Gifford, supra). Quite simply, SHC’s theory for its claim for lost profits is speculative. SHC’s other claims for consequential damages (attorneys’ fees for lobbying and bankruptcy, bankruptcy trustee fees, fees imposed by the Internal Revenue Service, and interest payments to banks and Stanley Sanders) are denied for failure of proof.
After considering all of the evidence, including the observance of the witnesses’ demeanor and the exhibits admitted into evidence at trial, the court finds that claimant has failed to establish by a preponderance of the evidence that it is entitled to damages. The claim, therefore, is dismissed and the Chief Clerk is directed to enter judgment. Any applications on which the court previously reserved judgment or which were not previously decided are denied.

. A form required by DOH for the rate increase. It is also known as AHCF-1 (transcript at 15).

. The act of publication is the transmittal to Computer Sciences in DOH “to load it on the tape and feed it into the computer system” (transcript at *546 22). Ordinarily, it takes 30 to 90 days from the submission of a cost report until the publication of the rate increase (transcript at 21).

. In the article 78 proceeding, defendant had asserted that it refused to post the approved revised rates because claimant was under investigation for billing Medicaid for services provided at unapproved locations. It was determined, however, that “there is no statutory, regulatory, or other authority providing for another final approval” by defendant. In other words, refusing to post the rates, for any reason, was not a course of action available to defendant at that juncture.

. Governmental functions of the State and its subdivisions are to be distinguished from proprietary functions, in which the government engages in activities that are “traditionally private enterprises” (Sebastian v State of New York, 93 NY2d 790, 793 [1999]). When engaged in proprietary .endeavors, the governmental entity is generally subject “to the same duty of care as private individuals and institutions engaging in the same activity” (Schrempf v State of New York, 66 NY2d 289, 294 [1985]).

. Recognition of qualified, rather than absolute, immunity appears to contradict the statement in Tango that discretionary governmental actions cannot result in liability “even if resulting from negligence or malice” (61 NY2d at 40), since malice would unquestionably constitute “bad faith.” There is no easy answer to this apparent contradiction, except to note that the governmental action under consideration in Tango — a probation officer’s decision to allow one parent to take custody of a couple’s children — was quasi-judicial in nature and, therefore, there was no need to address whether there could be liability for other types of action. In any event, all of the decisions cited above, in which qualified immunity was clearly recognized, postdate Tango.

. It should be noted that other courts have differentiated between common-law negligence claims and claims based on statutory private rights of action (see e.g. Uhr v East Greenbush Cent. School Dist., 94 NY2d 32, 38 [1999] [“The availability of a private right of action for the violation of a statutory duty — as opposed to one grounded in common-law negligence — is not a new concept”]; Herron v Long Beach Hous. Auth., 284 AD2d 499 [2d Dept 2001], lv denied 97 NY2d 604 [2001]; Rivera v Village of Spring Val., 284 AD2d 521 [2001]; Gibbs v Paine, 276 AD2d 743 [2d Dept 2000]; Mark G. v Sabol, 247 AD2d 15 [1st Dept 1998]; Nicol v Jenkins Fire Co., 192 AD2d 164 [3d Dept 1993]; Cardona v County of Albany, 188 Misc 2d 440 [Sup Ct, Albany County 2001]).

. These examples include the following: Velazquez v New York City Health & Hosps. Corp. (65 AD3d 981 [1st Dept 2009] [injury caused as the person was being carried down a set of stairs]); Lapidus v State of New York (57 AD3d 83 [2008] [incorrectly recorded guilty verdict led to extended incarceration]); Martinez v County of Monroe (50 AD3d 189 [4th Dept 2008] [employee was erroneously denied health care benefits]); Verizon N.Y., Inc. v Village of Athens (43 AD3d 526 [3d Dept 2007] [damage to underground lines when a village failed to contact a notification system]); Hunt v State of New York (36 AD3d 511 [1st Dept 2007] [assault on inmate after prison officials failed to carry out court order to place him in protective custody]); Tappan Wire & Cable, Inc. v County of Rockland (7 AD3d 781 [2d Dept 2004] [property damage caused by negligently maintained sewer system]); Steel v State of New York (307 AD2d 919 [2d Dept 2003] [serious assaults by convicted felon who was released by mistake]); Kagan v State of New York (221 AD2d 7 [2d Dept 1996] [inmate became deaf after prison medical staff failed to follow administrative guidelines]); Davis v State of New York (212 AD2d 939 [3d Dept 1995] [woman killed when probation officials failed to timely execute warrant for arrest of her ex-husband]); Marx v State of New York (169 AD2d 642 [1st Dept 1991] [tenant evicted because a court clerk failed to find a file]); National Westminster Bank, USA v State of New York (155 AD2d 261 [1st Dept 1989], affd 76 NY2d 507 [1990] [debtor whose judgment was not filed by court officers]); Ford Motor Credit Co. v State of New York (133 AD2d 980 [3d Dept 1987] [vehicle title erroneously sent to the wrong person, who then sold car]); Bell v State of New York (140 Misc 2d 778 [Ct Cl 1988], affd 154 AD2d 958 [1st Dept 1989] [law student incorrectly informed he had passed the state *554 bar exam]); Glowinski v Braun (105 AD2d 1153 [4th Dept 1984] [court officer’s failure to retire a warrant led to arrest]); Hudleasco, Inc. v State of New York (90 Misc 2d 1057 [Ct Cl 1977], affd on other grounds 63 AD2d 1042 [3d Dept 1978] [purchaser of corporation’s assets relied on incorrect information provided by the Secretary of State]); Stewart v State of New York (18 Misc 3d 236 [Ct Cl 2007] [improper recording of a fine led to unauthorized arrest]); De Jesus v State of New York (15 Misc 3d 1105[A], 2007 NY Slip Op 50506[U] [Ct Cl 2007] [inmate subjected to medical keeplock in contravention of governing regulations]); Lobel Fin. Corp. v State of New York (8 Mise 3d 662 [Ct Cl 2005] [omission of a lienholder’s name from vehicle’s certificate of title]); Kellman v State of New York (8 Misc 3d 502 [Ct Cl 2005] [improper filing of an order of attachment]); Schwandt v State of New York (4 Misc 3d 405 [Ct Cl 2004] [failure to invalidate arrest warrant led to subsequent arrest]); Ostrowski v State of New York (186 Mise 2d 890 [Ct Cl 2001] [strip search and arrest of individual who had already paid fine]); Gayle v State of New York (135 Misc 2d 570 [Ct Cl 1987] [keeplock confinement extended because of a miscalculation of dates]).

. It should be noted that liability for negligent performance of ministerial acts could also be based on a special duty, including a statutory private right of action. This route was rarely pursued because it is generally far easier to establish liability under the traditional principles of common-law negligence. Nevertheless, courts have recognized that officials could have a “special duty” to properly perform a ministerial act (see e.g. Schwartz v Heffernan, 201 Misc 101 [1951], affd 279 App Div 898 [1952], affd 304 NY 474 [1952]; National Westminster Bank, USA v State of New York, 155 AD2d 261 [1989], affd 76 NY2d 507 [1990]) and that often this special duty would coexist with the more general common-law duty (see e.g. Boland v State of New York, 218 AD2d 235 [3d Dept 1996]).

. Such terminology was not used, and the cases cited in this part of the decision (Steitz v City of Beacon, 295 NY 51, 56 [1945]; O’Connor v City of *557 New York, 58 NY2d 184, 189-190 [1983]; and Motyka v City of Amsterdam, 15 NY2d 134, 139 [1965]) address only whether certain statutes were enacted for the benefit of a particular class rather than the general public. As outlined above, a statute must have that quality in order to be applied to developing the common-law standard or to be deemed as establishing a private right of action, but the latter also requires consideration of whether such a right of action supports and is consistent with the overall legislative scheme and purpose. Those latter factors were not addressed in either Lauer or the cases it cited in support of this point.

. In Dinardo, which involved discretionary actions, the Court of Appeals stated that there was “no occasion” to decide whether discretionary negligence could ever lead to liability because “even assuming the school officials’ actions in this case were ministerial,” there was no special relationship between the Board of Education and the plaintiff (13 NY3d at 874; see also concurring opinion of Chief Judge Jonathan Lippman [“the broad immunity recognized for discretionary acts should not extend to situations where a special relationship is present” (13 NY3d at 876-877)]; Valdez v City of New York, 74 AD3d 76, 78 [1st Dept 2010] [in police protection cases “the Court did not intend to eliminate the special duty exception”]; Metz v State of New York, 27 Misc 3d 1209[A], 2010 NY Slip Op 50635[U], *10 [2010] [“Neither McLean nor Dinardo, however, address or appear to impact cases where a government actor is entrusted with discretionary authority, but fails to exercise any discretion in carrying out that authority”]).

. Appendix B of court exhibit 1, the Rosenfarb report, contains a disclaimer for “[a]ny information that we were not made aware of or could materially affect our opinion.” A similar disclaimer is not contained in the Egna Report.

. SHC ceased operations in 2008 because it could no longer operate profitably, but Mr. Sanders testified that this was not due to the delayed reimbursements (transcript at 106).

. SHC had multiple affiliates that were clinics with holding companies for the leases of such clinics (transcript at 52, 110, 116-117). Mr. Rosenfarb did not review any financial statements of the affiliates (transcript at 172).