[910 NYS2d 851]

Timothy Quackenbush, Claimant, v State of New York, Defendant. (Claim No. 107497.)

Court of Claims, September 27, 2010

**APPEARANCES OF COUNSEL**

*Brian Chapin York* for claimant. *Andrew M. Cuomo, Attorney General* (*Thomas G. Ramsay* of counsel), for defendant.

**OPINION OF THE COURT**

Philip J. Patti, J.

Claimant, a former inmate at Groveland Correctional Facility, sustained serious personal injury on exiting a van owned by the defendant and operated by Department of Correctional Services (DOCS) personnel on July 2, 1999. On that day claimant, who was housed at the Groveland Annex (Annex), was one of four inmates who were to be seen at the infirmary located on the main campus of the facility. This required the inmates to be transported by van from the Annex to the main facility. DOCS regulations required the inmates to be handcuffed with the ubiquitous black box affixed over the cuffs and attached to a waist chain, as well as having shackles applied to their ankles.

Chad Diaz, an inmate at the time of the accident, testified that he was to be seen at the infirmary that morning and was in the van during the transport from the Annex to the main campus. The vehicle used on the day of the accident was a van with a front door, requiring the inmates to take two steps to gain access to the interior of the van and the bench seats.[1] Since the distances from the ground at the Annex up to the first step and then to the second step (the van floor) were not great, the inmates could manage them without removing the ankle shackles. Once inside the van, the inmates sat on a bench along the side of the interior for the brief trip to the infirmary.[2] When they arrived at the infirmary, the van was parked on a slight incline facing the facility. One inmate exited through the front door while claimant, along with Mr. Diaz and the other inmate, were directed to the rear of the van to exit. According to both Mr. Diaz and claimant, Correction Officers (COs) Alan Beaty and Allen Lynch escorted them from the Annex to the infirmary on the date of the accident. CO Lynch assisted the inmate exiting from the front of the van. CO Beaty opened the rear door of the van, at which there were no steps, and directed the remaining inmates to take a seat near the door while he removed the leg restraints. He then assisted the unnamed inmate down onto a plastic crate[3] and then to the ground.

According to a directive dated June 18, 1990 from Deputy Commissioner Glenn S. Goord (exhibit 15), the use of a crate, in

---

**1.** The actual vehicle used is no longer in use by the defendant. Exhibits 1 and 2 represent a similar style of the van used, but the vehicle in the exhibits had dual rear doors while the actual van had only one door.

**2.** Exhibits 11 (a) through (hh) are a series of photographs which, while they do not show the interior of the actual van used, represent how the interior was laid out.

**3.** Exhibit 9 consists of a series of photographs of a crate similar to that used on the day of the accident.

his opinion, was an appropriate "step" to be used as an aid to assist an inmate entering or exiting a DOCS vehicle.

CO Beaty apparently performed the same procedure for Mr. Diaz, removing his leg restraints, assisting him onto the crate and then the ground. He then directed claimant to be seated and removed his leg restraints. What occurred thereafter is the crux of claimant's case and is in dispute.

According to Mr. Diaz, who had exited the van and was standing to the right some three to four feet from the rear of the van, claimant walked to the doorway and, without the assistance provided to the other inmates by CO Beaty, stepped from the rear of the van down onto the crate, which was comparable in size to a milk crate. The crate had been placed under the rear emergency exit door by CO Beaty to act as an intermediate step for the inmates as they exited. As shown in exhibits 10 (a) through (q), the area where he placed the crate sloped away from the rear of the van and the door from which claimant and the other two inmates exited.[4] Those inmates had been assisted down by CO Beaty since their wrists were restrained by cuffs and a block (black box), which in turn were hooked to a waist chain. According to Mr. Diaz,[5] claimant, who was the last to leave the van, was not given any assistance and, as he placed his foot down on the crate it tipped forward, then slid back and under the van, which caused claimant's body to strike the exit as he fell, with his head and neck snapping back toward the interior of the vehicle. He then fell to the ground and at some point was assisted to his feet by CO Beaty. At no time did Mr. Diaz ever hear CO Beaty or anyone else say that claimant had run out of the rear emergency exit of the van. Moreover, he was standing to the right of the van with an unobstructed view of the rear and stated that he did not see claimant running out of the van.

Claimant's testimony was generally consistent with that of Mr. Diaz. His leg irons had been removed by CO Beaty prior to his exiting. However, since he was six feet tall and the rear door was approximately four feet high, he had to stoop or bend down in order to exit the van. When he did this, his hands were still cuffed, secured by the black box and attached to a waist chain. He stated that the van was parked on an incline at the infirmary and the crate had been placed below the rear bumper as

---

4. The downward slope was approximately eight degrees as shown in exhibit 10.

5. He stated that the crate did not move when he stepped on it.

he stepped down. As his foot came in contact with the crate it tipped forward and then moved back toward the van, causing him to fall backward, half in and half out of the van. His back and upper extremities were snapped back and his left elbow hit the bumper. As he lay on the ground, he was advised not to move, and eventually he was assisted to his feet and brought into the infirmary. He stated that at the time he tried to exit the van CO Beaty was attending to the other two inmates and did not assist him.

Claimant stated that he recalled CO Beaty assisting Mr. Diaz as he exited the van and assumed he had done the same for the other inmate. He estimated that he started to exit about 10 to 15 seconds after Mr. Diaz. He did acknowledge that he had been transported by vans in the past and had exited from vans using a crate in the past without incident.

Claimant called Dr. Robert Sugarman who was offered as an expert in the field of Human Factors which is comprised of many disciplines, but chiefly the fields of applied experimental psychology and industrial engineering. The goal of Human Factors is to design systems that will be safe and comfortable to those using not just machines and other devices, but also a system that enhances safety for those using them. He stated that he did not have a specific degree in Human Factors as it was not offered as a distinct program at the time he completed his various courses of study. I accepted him as an expert in this field based not only on his educational background but also on his extensive experience in the field of Human Factors.

He opined that use of the rear door as an exit was unsafe as there was a front door that permitted the inmates to safely step down and out of the van. Exiting out of the rear door was less safe because it was only four feet in height, and as a result inmates were obliged to bend to exit rather than stand upright. In addition, he stated that exiting from the rear did not provide a suitable step down for anyone exiting while in restraints. Use of the front door was an easier, safer and available passage for the inmates. He was further of the opinion that using the crate as a step was unsafe since the top and base were the same size and that, to be safe, the base should be broader than the top and should be made from heavier material, giving it stability and diminishing the chances that it could slip or tip over.

Dr. Sugarman also pointed out that the crate used by CO Beaty in this instance was on a slight downward slope, was constructed of plastic (exhibit 16), and can slip and tip, as oc-

curred in this case. He also stated that, based on the measurements of the grade of the slope and the weight (2.5 pounds) and dimensions of the crate which were provided to him, it would only take two pounds of horizontal force to cause the crate to move. He was of the opinion that even on a flat surface, a plastic milk crate of these dimensions and weight is unsafe to use as a step, even with assistance provided to the person exiting through the rear of the van. Consequently, he concluded that the use of the rear exit, the use of the crate and the lack of assistance in combination were substantial contributing factors in claimant's fall and injury.

Dr. Sugarman admitted that he never visited the facility and never saw the van or the area where the accident occurred in person, but rather formed his opinions based upon (1) the photographs of the area, (2) a van similar to the one used on the day of the accident, and (3) the measurements made by claimant's attorney and an assistant. He also stated that he was unaware of any standard which specifically prohibited the use of a crate as a step. In fact, he was aware of a DOCS directive that permitted the use of a crate as a step to aid inmates entering or exiting a vehicle (exhibit 15). It was his opinion that a reasonable person, upon reading that memo, could conclude that the use of the crate as a step was in fact a safe way to load or unload an inmate.

On redirect he testified that someone reading that memo could conclude that the use of the crate was in fact the official policy of DOCS and therefore its use as a step was permissible.

The defendant called Correction Officer Allen Lynch, one of the COs transporting claimant and the other three inmates on the day of the accident. Mr. Lynch stated that while he had retired from service prior to his trial testimony, he recalled the accident and essentially confirmed the procedures followed in transporting the prisoners to the infirmary. He stated that CO Beaty was driving the van on that particular day. He testified that he removed one inmate through the front door after removing his leg irons. He was aware that inmates were exiting from the rear but did not see the accident. CO Lynch did, however, hear a commotion from the rear of the van and was told by CO Beaty that claimant "ran out" the back of the van and stated to CO Beaty that he was not hurt. CO Lynch stated that it was customary to use a crate depending on the vehicle that was being used. He then stated that on most days when inmates were transported from the Annex to the main facility, a van equipped

with a running board was used and a crate was not necessary. However, on the day of the accident a different van was used, requiring the use of a crate when utilizing the rear emergency exit door. At some later time CO Lynch stated that the claimant told him that he was going to sue the State for his injuries.

On cross-examination, CO Lynch testified that the only reason the back door or emergency exit was used on that day was due to a time constraint, since the inmates had to be at the infirmary for doctor's appointments (call-outs). He estimated that if they had used the front door for all four of the inmates it would have taken them perhaps five minutes to remove all the restraints. He also acknowledged that the distance from the emergency exit to the crate was greater than the distance from the floor of the van to the first step down at the front exit. He went on to state that he personally did not like to use the milk crate since it was not designed to be a step and he did not believe it was safe. He added that the use of the emergency exit was not his decision.

Correction Officer Alan Beaty also had retired from DOCS prior to the date of the trial. He essentially agreed with the prior testimony as it pertained to the events leading up to the time that the van arrived at the infirmary. He then went to the rear of the van, opened the rear door and directed the inmates to move to the rear where he would remove their leg irons before they stepped out and down onto the crate. He stated that he placed the crate so that it was close to the rear bumper and then assisted the first two inmates as they exited the van escorting them off to the right. As he returned to the doorway, he stated that the claimant came running out of the rear door and his foot struck the crate which kicked out from under him, propelling him backward. He said that he went to claimant who stated that he was not hurt. But, since he had fallen, claimant was told that he still had to be seen by medical personnel. CO Beaty stated that he had used the crate as a step for several years and never had an inmate fall.

On cross-examination CO Beaty stated that he used the rear exit because the inmates were seated near that door. He also confirmed that he placed the crate below and a little away from the rear bumper. He described the area as having a blacktopped surface and a slight downward slope away from the rear exit door of the van. He described positioning himself in front of the crate and assisting the first two inmates down. He went on to testify that the claimant (after his leg irons had been removed

and been put aside inside the van) jumped out of the seat and ran out from the rear of the van stepping down onto the crate, which flipped, causing him to fall to the ground. CO Beaty stated that he had moved out of the way as claimant came out of the van to avoid being hit.

On rebuttal claimant recalled his expert, Dr. Sugarman, who opined that it was not feasible for the accident to have occurred in the manner testified to by CO Beaty. It would be impossible for claimant to have run out of the van, or for that matter to have quickly moved up and out the door[6] since claimant would have to have crouched down to get through the four-foot-high door. Moreover, with the momentum caused by running or moving quickly, his center of gravity would have propelled him forward and on to his head, not backward as described by claimant, Mr. Diaz and even CO Beaty.

It has long been settled law that the State has a duty to protect inmates from reasonably foreseeable risks of harm (*Castiglione v State of New York*, 25 AD2d 895 [1966]), but it is not the insurer of an inmate's safety (*Preston v State of New York*, 59 NY2d 997 [1983]). The State is liable for an injury suffered by an inmate if the cause of the injury could have been reasonably foreseen and the State failed in its duty to prevent it (*Spadaro v State of New York*, 38 Misc 2d 489 [1963], *affd* 28 AD2d 604 [1967]).

In arriving at a determination of whether the State breached its duty of care to claimant in this case, I must assess the credibility of the witnesses. I cannot disregard the fact that a significant period of time has elapsed between the date of this accident and the trial, and, as a consequence, memory of the events leading to the fall have dimmed to some extent. That having been said, I find that the version of the facts presented by claimant and his witnesses is most accurate. The testimony of the State's witnesses carried less probative weight, since one of the COs involved in the transport on that day never saw the accident, and the CO who witnessed that accident offered inconsistent versions of what occurred.

I further find that the State breached its duty of care to claimant by failing to provide him with safe egress from the van. The use of the crate as a step down from the van, exacerbated by a downward slope, in my opinion was improper and in

---

**6.** CO Beaty, in rather confusing fashion, described claimant's action as running, and later as moving quickly out the door.

essence was an accident waiting to happen. In fact, CO Lynch stated that he felt the use of the crate as a step was unsafe as it was not designed to be used as a step. Moreover, I find incredible the explanation offered by CO Beaty regarding his decision to have the inmates exit from the rear of the van. He stated that he decided to use the emergency exit at the rear because of the constraints of time, but failed to explain what time constraints they were under. Finally, I cannot accept his contention that claimant ran out of the van and somehow managed to fall backward with part of his body ending up in the van before he fell to the ground.

What is clear on this record is that there was a perfectly safe means of egress from the van through the front door, which was equipped with a safe step down to the ground. Removing the leg irons from the inmates and placing them aside was not a time-consuming measure. Once they were out of the bus the two COs would then have to remove the additional wrist shackles which clearly would have taken either the same or less time than the procedure described at trial.

Moreover, after the leg irons were removed, the inmates were still restrained by the handcuffs attached to a waist chain as well as the ubiquitous "black box." In my opinion, because of this limitation of mobility, the use of the crate was unsafe since, without assistance, this fall was inevitable.

The uncontradicted testimony of Dr. Sugarman, refuting CO Beaty's description of the incident, is most persuasive. The dynamics of someone either running or quickly moving out of the van clearly would propel him forward, not backward, as testified to by CO Beaty. Further, any abrupt action by claimant as described by CO Beaty would have resulted in claimant's center of gravity being forward, which in turn would have resulted in his impacting the surface with the front part of his body, incurring wholly different injuries.

In reaching this opinion I have also considered defendant's reliance upon what it characterizes as an explicit directive of the DOCS administration (exhibit 15) permitting use of a crate as an accepted practice to afford an aid for inmates entering or exiting a vehicle. This appears misplaced as that procedure shall be followed "[w]henever an inmate who is wearing leg irons or is physically handicapped is being transported in a vehicle that *requires* a large step up or down to enter or exit" (emphasis supplied). CO Beaty's explanation, that since time was short he opted to utilize the elevated rear door of the vehicle with no

steps rather than the available front door with a step, is without support in the record and would be charitably characterized as irrational and unreasonable. Moreover, it must be remembered that the crate was placed on a downward slope of eight degrees, and that according to Dr. Sugarman, its square base design impairs its stability even on a flat surface, and its instability is magnified where, as here, there is a slope. Its use under these circumstances might be characterized as unreasonable, perhaps a failure to exercise any judgment whatsoever. Such use does not allow the State to succeed in its argument that it has met its duty to protect its inmates, and I reject the State's implication of the same.

Last, I have examined the applicability of the Court of Appeals decision in *McLean v City of New York* (12 NY3d 194 [2009]), and its progeny, and find it to be nihil ad rem. As succinctly reviewed by Justice Judith A. Hard in *Signature Health Ctr., LLC v State of New York* (28 Misc 3d 543, 547 n 4 [2010]):

> "Governmental functions of the State and its subdivisions are to be distinguished from proprietary functions, in which the government engages in activities that are 'traditionally private enterprises' (*Sebastian v State of New York*, 93 NY2d 790, 793 [1999]). When engaged in proprietary endeavors, the governmental entity is generally subject 'to the same duty of care as private individuals and institutions engaging in the same activity'(*Schrempf v State of New York*, 66 NY2d 289, 294 [1985])."[7]

Defendant's interpretation of *McLean* would potentially foreclose any State liability for any act found to be ministerial or discretionary, in the absence of the special duty exception, including all proprietary functions. As broad a brush as seemingly painted by the Court of Appeals in *McLean (but see Dinardo v City of New York*, 13 NY3d 872, 875 [2009, Lippman, Ch. J., concurring]), it is manifestly unfathomable that it intended to judicially legislate the undermining of the limited waiver of sovereign immunity enacted in 1939 as Court of Claims Act § 8. Rather it is more comprehensible to consider *McLean* as the wind bending the willow and not a monsoon felling an oak.

Here, the defendant has undertaken the complete care, custody and control of claimant, an inmate, who was completely

7. *Also see Metz v State of New York*, 27 Misc 3d 1209(A), 2010 NY Slip Op 50632(U) (2010, Ferreira, J.).

dependent and totally reliant upon his warders. I find that the defendant breached its duty of care to claimant, and I further find that it bears total responsibility for his injuries and that claimant did not engage in any conduct that could be considered as contributing to the injuries he suffered as a result of this accident.

All motions not heretofore ruled upon are now denied.